STROUD, Judge.
 

 *557
 
 This case started when the music stopped, in an aviatic version of the game of musical chairs-or musical engines-Avantair was playing with its airplanes. The music stopped when Avantair was forced into bankruptcy, and at that moment, defendants' airplane had no engines, while plaintiffs' airplane had two engines that were originally on defendants' airplane. Plaintiffs filed this declaratory judgment action to resolve the parties' dispute over who gets to keep the engines. Because the controlling contracts allowed Avantair to play musical chairs, plaintiffs get to keep the engines, so we affirm the trial court's order granting summary judgment in plaintiffs' favor and denying defendants' request for summary judgment.
 

 Background
 

 Plaintiff Clifford Press is an authorized representative for the 14 other plaintiffs; the 15 plaintiffs are the fractional owners of a certain Piaggio Avanti P-180 aircraft ("Plaintiffs' Airplane").
 
 [1]
 
 The plaintiffs acquired their interests in Plaintiffs' Airplane by purchasing a fractional interest from Avantair, Inc. ("Avantair"), as part of its "Fractional Aircraft Ownership Program" ("the Avantair Program"). The plaintiffs were all parties to Ownership Agreements for their aircraft, although the individual plaintiffs each purchased their fractional interests in Plaintiffs' Airplane on different dates. Under the Avantair Program, each plaintiff was the owner of an undivided interest in Plaintiffs' Airplane, and
 
 *558
 
 the plaintiffs were registered with the Federal Aviation Administration ("FAA") as the owners.
 

 Defendants are the fractional owners of another airplane, a Piaggo P-180 aircraft bearing the tail number N106SL ("Defendants' Airplane"). Defendants each purchased fractional interests in Defendants' Airplane from Avantair in the same manner and under the same terms as plaintiffs did for Plaintiffs' Airplane.
 

 Plaintiffs and defendants participated in the Avantair Program. The parties all signed and "executed in substantially the same form and substance" an Aircraft Interest Purchase Agreement ("Purchase Agreement") and a Management & Dry Lease Exchange Agreement (the "MDLA") with Avantair. Under the MDLA, Avantair was engaged as the "Manager" of the Avantair Program. Avantair leased both Plaintiffs' and Defendants' Airplanes (as well as other airplanes owned by other owners) from their respective owners and was obligated to "provide or procure certain administrative and aviation support services with respect to each Program Aircraft, including, without limitation, scheduling, maintenance, insurance, record keeping, flight crew training and scheduling, and fuel for or with respect to any Program Aircraft."
 

 In
 
 In re Avantair, Inc.
 
 ,
 
 638 F. App'x 970
 
 (11th Cir. 2016) (unpublished) (
 
 per curiam
 
 ), the Eleventh Circuit explained what happened next:
 

 When Avantair began experiencing financial troubles, the quality of its maintenance operations took a nose dive. To keep as
 
 *368
 
 many planes as possible flying, Avantair cannibalized parts from other planes in the fleet, effectively grounding the donor planes. In addition, Avantair failed to keep adequate safety records of the part transfers. When the Federal Aviation Administration caught wind of Avantair's activities, it grounded Avantair's fleet, forcing the company to cease operations and eventually enter bankruptcy.
 

 Id.
 

 at 971
 
 .
 

 On 25 July 2013, creditors forced Avantair into involuntary Chapter 7 bankruptcy, which was still pending in the United States Bankruptcy Court for the Middle District of Florida, Tampa Division when this declaratory judgment action was filed.
 
 [2]
 
 During the bankruptcy proceedings,
 
 *559
 
 the parties learned that Avantair had removed the engines originally installed on Defendants' Airplane and installed those engines on Plaintiffs' Airplane, leaving Defendants' Airplane with no engines as of the bankruptcy.
 
 [3]
 
 A dispute developed between plaintiffs and defendants regarding the ownership of the engines. Defendants claimed that they never consented to the removal of the engines from Defendants' Airplane and that plaintiffs had no ownership interest in the engines, so plaintiffs should return the engines to defendants.
 

 The specific engines installed as original equipment as of 2003 on Defendants' Airplane bore serial numbers PCE-RK0088 on Engine A and PCE-RK0087 on Engine B
 
 [4]
 
 . In addition, maintenance records for Defendants' Airplane showed both Engines A and B were removed in 2007 to be overhauled because they had used up almost all of the flying hours allowed by FAA regulations. In November 2007, the refurbished Engine A was installed on one Avantair Program aircraft and refurbished Engine B was installed on another; the engines were not on either Plaintiffs' Airplane or Defendants' Airplane. The engines were again removed and refurbished in 2011, and both Engines A and B were installed on Plaintiffs' Airplane in February 2012.
 

 On 4 November 2014, plaintiffs filed a complaint seeking a "declaratory judgment pursuant to
 
 N.C. Gen. Stat. § 1-253
 
 ,
 
 et seq.
 
 , ... granting them possession of, control over, and marketable title to [Plaintiffs' Airplane][.]" In the alternative, plaintiffs sought "a declaration, pursuant to the Court's equitable power to quiet title to personal property, granting them possession of, control over, and marketable title to [Plaintiffs' Airplane]." Defendants filed an amended counterclaim on 20 May 2016 for conversion, trespass to chattel, and unjust enrichment, to which plaintiffs filed an answer on 31 May 2016.
 

 On or about 24 June 2016, plaintiffs moved for summary judgment, arguing the court should enter a declaratory judgment that plaintiffs "are entitled to possession and control of, and marketable title to [Plaintiffs' Airplane], including all engines presently affixed to the aircraft[,]" and should dismiss defendants' counterclaims. Plaintiffs asserted there was no genuine issue of material fact and that they are entitled to judgment as a matter of law both on their affirmative claim and on defendants' counterclaims.
 

 *560
 
 Defendants also moved for summary judgment on 24 June 2016 with an incorporated memorandum. Defendants alleged there were no genuine issues of material fact and requested that the court deny the relief sought by plaintiffs and enter summary judgment for defendants on their claims for conversion, trespass to chattel, and unjust enrichment, and that the court require plaintiffs to return the engines to defendants. Defendants argued that they were the owners of Engines A and B and that they had not transferred ownership rights to plaintiffs. A series of responses and replies ensued.
 

 The trial court held a hearing on 2 September 2016 on the parties' cross-motions for
 
 *369
 
 summary judgment. Following the hearing, the trial court entered its Order on Cross-Motions for Summary Judgment on 21 September 2016. In the order, the court concluded:
 

 1. The parties agree, and there is no issue of fact, that the operative documents between parties and Avantair, Inc. are identical in substance.
 

 2. The language and terms of the Management & Dry Lease Exchange Agreement and the Aircraft Interest Purchase Agreement (collectively, the "Agreements") is plain and unambiguous. The effect to be given unambiguous language in a contract is a question of law for the Court....
 

 3. Based on the plain and unambiguous language of the Agreements, Plaintiff is entitled to Summary Judgment on its claim for declaratory judgment and Plaintiff is entitled to summary judgment as against Defendants' counter-claims.
 

 4. Having concluded that the language of the Agreements is unambiguous, the Court need not consider extrinsic evidence of the parties' intent offered by each party; however, even if the Court were to conclude the Agreements were ambiguous and therefore consider competent extrinsic evidence of the parties' intent beyond the language of the Agreements, the Court concludes that the undisputed facts from such extrinsic evidence before the Court establishes that there is no genuine issue of material fact, and Plaintiffs would be entitled to Summary Judgment as a matter of law as to its claim for declaratory judgment and as against Defendants' counter-claims.
 

 (Citations omitted).
 

 *561
 
 The trial court granted plaintiffs' motion for summary judgment, denied defendants' motion for summary judgment, dismissed defendants' counterclaims with prejudice, and concluded that defendants "have no claim to the engines currently attached to [Plaintiffs' Airplane] and Plaintiffs are entitled to possession and control of, and marketable title to, [Plaintiffs' Airplane], including all engines presently affixed to the aircraft." Defendants timely appealed to this Court.
 

 Discussion
 

 On appeal, defendants contend that the trial court erred in granting plaintiffs' motion for summary judgment and denying defendants' summary judgment motion. For the reasons that follow, we disagree.
 

 I. Standard of Review
 

 Defendants have appealed from the trial court's order granting summary judgment for plaintiffs, so we review the trial court's determination
 
 de novo
 
 :
 

 The standard of review for an order of summary judgment is firmly established in this state. We review a trial court's order granting or denying summary judgment de novo. Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law. All facts asserted by the adverse party are taken as true, and their inferences must be viewed in the light most favorable to that party.
 

 Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC
 
 ,
 
 365 N.C. 520
 
 , 523,
 
 723 S.E.2d 744
 
 , 747 (2012) (citations and quotation marks omitted).
 

 The issues here arise from interpretation of the various agreements entered into by the parties with Avantair. All of the documents regarding the Avantair Program designate Florida law as the governing law for interpretation of the documents. For example, the MDLA includes this provision: "Governing Law and Venue. The Program Documents shall be interpreted and governed by the laws of the State of Florida, without regard to its conflict of laws principles." Even though the parties have not mentioned Florida law, under
 
 N.C. Gen. Stat. § 8-4
 
 (2017) we must take judicial notice of Florida law and use Florida law to resolve any substantive issues:
 

 *562
 
 [T]he contracts expressly provided that "this contract shall be construed according to the laws of the Commonwealth of Virginia." We, therefore, hold that the substantive issues in the present case are to be
 
 *370
 
 resolved under the law of Virginia, of which we are required to take judicial notice by G.S. 8-4. North Carolina law, however, governs the procedural matters.
 

 Tanglewood Land Co. v. Wood
 
 ,
 
 40 N.C. App. 133
 
 , 137,
 
 252 S.E.2d 546
 
 , 550 (1979) (citation omitted).
 
 See also
 

 Arnold v. Charles Enterprises
 
 ,
 
 264 N.C. 92
 
 , 96,
 
 141 S.E.2d 14
 
 , 17 (1965) ("Throughout, neither party has made any reference to the law of New York or that of Virginia, yet we are required to take judicial notice of foreign law. G.S. § 8-4."). Florida's rules of contract interpretation are essentially the same as North Carolina's, but since the controlling Avantair Program documents are entered under and to be interpreted under Florida law, we will use Florida law.
 

 Just as in North Carolina, under Florida law, we consider questions of contract interpretation
 
 de novo
 
 .
 
 SCG Harbourwood, LLC v. Hanyan
 
 ,
 
 93 So.3d 1197
 
 , 1200 (Fla. Dist. Ct. App. 2012) ("We may consider de novo whether contract terms are unambiguous.").
 

 Contract interpretation begins with a review of the plain language of the agreement because the contract language is the best evidence of the parties' intent at the time of the execution of the contract. In construing the language of a contract, courts are to be mindful that "the goal is to arrive at a reasonable interpretation of the text of the entire agreement to accomplish its stated meaning and purpose."
 

 When the terms of a contract are ambiguous, parol evidence is admissible to explain, clarify or elucidate the ambiguous terms. However, a trial court should not admit parol evidence until it first determines that the terms of a contract are ambiguous. If parol evidence is properly admitted and the parties submit contradictory evidence regarding their intent, then the trial court's factual findings regarding the parties' intent are reviewed for competent, substantial evidence.
 

 Taylor v. Taylor
 
 ,
 
 1 So.3d 348
 
 , 350-51 (Fla. Dist. Ct. App. 2009) (citations and quotation marks omitted).
 

 It is never the role of a trial court to rewrite a contract to make it more reasonable for one of the parties
 
 *563
 
 or to relieve a party from what turns out to be a bad bargain. A fundamental tenet of contract law is that parties are free to contract, even when one side negotiates a harsh bargain.
 

 Barakat v. Broward Cnty. Hous. Auth
 
 .,
 
 771 So.2d 1193
 
 , 1195 (Fla. Dis. Ct. App. 2000) (citations omitted).
 

 II. Language of the Subject Agreements: Plain and Unambiguous
 

 Defendants first argue that the language in the subject agreements was "not unambiguous," so the trial court erred in granting summary judgment because extrinsic evidence must be used to show the intent of the parties and this presents a jury question.
 

 An interpretation of a contract which gives a reasonable, lawful and effective meaning to all of the terms is preferred to an interpretation which leaves a part unreasonable, unlawful or of no effect. Furthermore, a contract's language is ambiguous only if it is susceptible to more than one reasonable interpretation. A true ambiguity does not exist in a contract merely because the contract can possibly be interpreted in more than one manner. Indeed, fanciful, inconsistent, and absurd interpretations of plain language are always possible.
 

 Nabbie v. Orlando Outlet Owner, LLC
 
 ,
 
 237 So.3d 463
 
 , 466-67 (Fla. Dis. Ct. App. 2018) (citations, quotation marks, and brackets omitted).
 

 Extrinsic evidence may be considered only if the contract terms are ambiguous.
 

 Florida courts have consistently declined to allow the introduction of extrinsic evidence to construe such an ambiguity because to do so would allow a trial court to rewrite a contract with respect to a matter the parties clearly contemplated when they drew their agreement. The end result would be to give a trial court free reign to modify a contract by supplying information the contracting parties did not choose to include.
 

 *371
 
 Indeed, the Supreme Court put it more bluntly in
 
 Hamilton Constr. Co. v. Bd. of Pub. Instruction of Dade Cty.
 
 ,
 
 65 So.2d 729
 
 , 731 (Fla. 1953) : The parties selected the language of the contract. Finding it to be clear and
 
 *564
 
 unambiguous, we have no right-nor did the lower court-to give it a meaning other than that expressed in it. To hold otherwise would be to do violence to the most fundamental principle of contracts.
 

 Clayton v. Poggendorf
 
 ,
 
 237 So.3d 1041
 
 , 1046-48 (Fla. Dist. Ct. App. 2018) (citation and quotation marks omitted).
 

 Defendants argue that the subject agreements are not "plain and unambiguous" because the agreements "do not clearly and unambiguously state that ownership of the subject engines is transferred upon affixation to another owners' aircraft." (All caps in original). Defendants argue that
 

 The plain reading of paragraph 7 allows the Manager (of the now defunct Avantair) to "upgrade, alter, or modify" to comply with FAA regulations, and provide for consistency among the Program aircraft. "At the owner's expense," at the very least, implies that the Manager would need to purchase "new" parts to replace the ones that needed to be replaced, or repair what needed to be repaired and the owner would be responsible for the cost of doing so, which would logically be ... for the benefit of the owner. It does not provide Avantair with an authorization to "cannibalize" parts from one aircraft, and install them onto another aircraft and then call it theirs.
 

 We first note that defendants do not argue that the agreements are ambiguous, but instead that they are "not plain and unambiguous." In addition, "[a] true ambiguity does not exist in a contract merely because the contract can possibly be interpreted in more than one manner. Indeed, fanciful, inconsistent, and absurd interpretations of plain language are always possible."
 
 Id.
 
 at 467 (citation, quotation marks, and brackets omitted). Defendant's double negative argument-"not unambiguous"-could be read as an argument that the agreements
 
 are
 
 ambiguous, so we will address it on that basis. But their argument is only that the agreements do not "state" that engines can be removed from one Avantair Program aircraft and installed on another. That is not so much an ambiguity but a lack of specificity-or omission of a term that could have been included, but was not. Defendants focus on the phrase "at the Owner's expense" and interpret it to mean that new parts must always be purchased to replace old parts, including engines. But we may "not read a single term or group
 
 *565
 
 of words in isolation."
 
 Am. K-9 Detection Servs., Inc. v. Cicero
 
 ,
 
 100 So.3d 236
 
 , 238 (Fla. Dis. Ct. App. 2012). Defendants' interpretation of "at the Owner's expense" is not convincing, particularly since airplane maintenance involves much more than purchasing new parts. And under the MDLA, owners must pay for all maintenance, upgrades, alterations, or modifications. Defendants' argument also ignores the other provisions of the MDLA and the requirements of the FAA specifically referenced by the subject agreements. We must consider the agreements as a whole.
 

 As noted above, the parties in the Avantair Program were subject to a variety of agreements-Ownership Agreements, Purchase Agreements, and the MDLA. The Ownership Agreements "set forth [the Owners] understanding and agreement as to Interests and the ownership of the Aircraft." The purpose of the Ownership Agreements was to "set forth the agreement of the Owners regarding the management of the Aircraft[.]" The parties were also subject to the MDLA, which sets forth the terms for use of the Avantair Program aircraft and includes a section entitled "Covenants, Representations and Warranties of Manager;" Avantair was the Manager. The MDLA includes several relevant provisions regarding maintenance of the Avantair Program aircraft:
 

 2. Maintenance. Manager shall (i) maintain the airworthiness certification of the Aircraft in good standing, (ii) arrange for the inspection, maintenance, repair and overhaul of the Aircraft in accordance with maintenance programs and standards established by the manufacturer of the Aircraft and approved by the FAA, (iii) keep
 
 *372
 
 the Aircraft in good operating condition, and (iv) maintain the cosmetic appearance of the Aircraft in a similar condition, except for ordinary wear and tear, as when delivered to the Owner. Manager agrees to maintain the enrollment of the specified engines in an FAA approved engine program.
 

 ....
 

 7. Aircraft Modifications. Manager may, in its sole discretion, at Owner's expense, upgrade, alter or modify the Aircraft to (i) comply with Manager's interpretations of FAR; (ii) be consistent with industry standards, (iii) comply with, or otherwise permit the Aircraft to be operated under FAR Part 135, (iv) maintain the marketability of the Aircraft, or (v) provide for consistency in equipment, accessories or parts with respect to the Aircraft and any other program Aircraft.
 

 *566
 
 ....
 

 9. Compliance of Program with FARs. Manager shall be responsible for ensuring that the Program conforms to all applicable requirements of the FAR.
 

 Under these provisions, Avantair had to maintain all Avantair Program aircraft in accord with the Federal Aviation Regulations (FAR) and specifically, to operate the aircraft in compliance with FAR Part 135. FAR Part 135 is 14 CFR Part 135, entitled "OPERATING REQUIREMENTS: COMMUTER AND ON DEMAND OPERATIONS AND RULES GOVERNING PERSONS ON BOARD SUCH AIRCRAFT." Defendants do not dispute that the FAR require routine engine maintenance and after a certain number of flying hours, engines must be entirely overhauled. Although the Avantair Program documents do not have a definition of "maintenance," they require compliance with the FAR ("Manager shall be responsible for ensuring that the Program conforms to all applicable requirements of the FAR."). FAR Part 1 includes a definition of "maintenance:" "Maintenance means inspection, overhaul, repair, preservation, and the replacement of parts, but excludes preventive maintenance."
 
 [5]
 
 14 CFR 1.1 - General definitions. Refurbishing an engine is "maintenance" under this definition.
 

 On defendants' argument that the agreements require, or at least that the parties actually intended, that specific engines must remain on Defendants' Airplane, we note that the MDLA and Purchase Agreements for each airplane specifically identified the aircrafts only by the make, model, and tail number. The Ownership Agreements identified each aircraft by make, model, and tail number "together with engines, components, accessories, parts, equipment and documentation installed thereon or attached thereto or otherwise pertaining thereto (collectively, "the Aircraft")." None of the agreements mention any specific serial numbers or other identifying information for any engine or other component of Plaintiffs' and Defendants' Airplanes.
 

 Defendants presented affidavits, including one from the Chief Operation Officer of Avantair which states his understanding of the Avantair Program documents. They argue that "the program documents did not allow for the transfer of ownership of any aircraft component parts." But because the documents are unambiguous, the trial court
 
 *567
 
 correctly did not consider extrinsic evidence of how various people interpreted the Avantair Program documents.
 

 Defendants additionally argue that Section VI, Paragraph 7 of the MDLA regarding "Modifications" was not clear or unambiguous and that it did not include the right to swap engines, as done in the Avantair Program. Paragraph 7 allowed Avantair "in its sole discretion, [to] upgrade, alter or modify the Aircraft to (i) comply with Manager's interpretations of FAR; (ii) be consistent with industry standards, (iii) comply with or otherwise permit the Aircraft to be operated under FAR Part 135." We must read this provision of the MDLA in conjunction with other provisions of the agreement which required Avantair to "(i) maintain the airworthiness certification of the Aircraft in good standing, (ii) arrange for the inspection, maintenance, repair and overhaul of the Aircraft
 
 *373
 
 in accordance with maintenance programs and standards established by the manufacturer of the Aircraft and approved by the FAA." Defendants do not dispute that the engines must be removed from an airplane when they have depleted their allowed flying hours and the engines must be overhauled. When engines are removed for maintenance, Avantair could either leave an airplane with no engines or install other engines on the airplane so it could continue to be used. And the MDLA contemplated that the Avantair Program aircraft would be properly maintained and available for use; that was the purpose of the Avantair Program.
 

 In addition, nothing in the MDLA or other Avantair Program documents requires that a particular engine must stay on a particular aircraft. The engines could have been identified by serial number in the Ownership Agreements, Purchase Agreements, or MDLA, but they were not. The dispute here arose only because at the moment of Avantair's bankruptcy, Defendants' Airplane had no engines. Defendants purchased their fractional interests at different times, between the years of 2004 and 2013, so different engines-or even no engines-were installed on Defendants' Airplane when some defendants actually acquired their interests in that aircraft. If the parts actually installed on Defendants' Airplane at the moment of purchase were required to stay the same, the defendants who acquired a fractional interest in Defendants' Airplane when it had no engines at all would, by this logic, not be entitled to re-installation of Engines A and B; they would be entitled only to an airplane with no engines.
 

 Both parties cite
 
 In re Avantair, Inc.
 
 , an unpublished decision of the Eleventh Circuit Court of Appeals involving the same fractional-owner Avantair Program, where the Eleventh Circuit affirmed an order of the Bankruptcy Court that "concluded that the program documents
 
 *568
 

 unambiguously
 
 designed a fractional-ownership program, with each shareholder necessarily owning a share of a specific plane."
 
 In re Avantair, Inc.
 
 , 638 Fed. Appx. at 972 (emphasis added). In
 
 In re Avantair, Inc.
 
 , the proposed plan required that each Avantair Program aircraft be sold and the proceeds distributed to each plane's fractional owners.
 
 Id
 
 . at 971-72. As in this case, some of the aircraft were operational and in good repair at the time of the bankruptcy, while others were missing parts and of greatly reduced value.
 
 Id.
 
 Some of the owners whose planes were missing parts at the time of the bankruptcy contended that all of the owners had an interest in all of the Avantair Program aircraft, so all of the planes should be sold and the total proceeds from all of the planes be distributed to all of the owners in accord with their fractional interests.
 
 Id.
 
 This manner of distribution would increase the value distributed to the owners whose planes lacked parts at the time of bankruptcy.
 
 Id
 
 . at 972. The bankruptcy court rejected this argument, finding that the Avantair Program documents executed by the participant-owners-exactly the same documents as in this case-"authorized Avantair to swap parts between planes to maximize the efficiency of the program."
 
 Id
 
 . The Eleventh Circuit affirmed and found no error with the Bankruptcy Court's conclusion that "[t]o the extent that Avantair failed to replace parts or maintain the donor planes, ... the owners of such planes have a claim against Avantair (or the estate) for breaching its obligations to replace parts or maintain the donor planes but ... the authorized swapping of parts did not and could not commingle the participants' ownership interests."
 
 Id
 
 .
 

 An unpublished opinion from the Eleventh Circuit has no precedential effect even in the Eleventh Circuit, nor is it binding authority over this Court.
 
 See
 
 Eleventh Circuit Rule 36-2, Unpublished Opinions ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority."); (
 
 Enoch v. Inman
 
 ,
 
 164 N.C. App. 415
 
 , 420,
 
 596 S.E.2d 361
 
 , 365 (2004) ) ("[T]he North Carolina Supreme Court has ... held that North Carolina appellate courts are not bound, as to matters of federal law, by decisions of federal courts other than the United States Supreme Court."). But
 
 In re Avantair, Inc.
 
 is helpful to our analysis. Defendants contend that it differs from this case because it involved the limited issue of how to distribute aircraft sale proceeds through bankruptcy, rather than
 
 *374
 
 the ownership of aircraft parts. Although the ultimate issue was not identical, as defendants claim in their brief on appeal, the Eleventh Circuit ultimately concluded that the subject Avantair Program documents "unambiguously designed a
 
 *569
 
 fractional-ownership program, with each shareholder necessarily owning a share of a specific plane."
 
 In re Avantair, Inc.
 
 , 638 Fed. Appx. at 972. And defendants further concede "the Bankruptcy Court found that, under certain circumstances, the program documents authorized Avantair to swap parts between planes to maximize the efficiency of the program[.]" The Eleventh Circuit's analysis of the Avantair Program documents is in accord with ours. The trial court correctly determined that the language and terms in the MDLA and Purchase Agreements "is plain and unambiguous" and that based on the subject agreements, plaintiffs are "entitled to Summary Judgment on [their] claim for declaratory judgment[.]"
 

 Defendants next contend that the trial court should not have granted plaintiffs' summary judgment motion and denied defendants' motion, and argue that the court "also erred in determining that even if the language of the contract was ambiguous, the extrinsic evidence established there was no genuine issue of fact, and that Plaintiffs were entitled to judgment as a matter of law." As we have concluded that the trial court correctly determined that the contract was plain and unambiguous, we need not address this argument.
 

 We hold that the trial court properly granted summary judgment for Plaintiffs based on the plain and unambiguous terms of the Avantair Program documents.
 

 III. Counterclaims
 

 Defendants argue that the trial court erred in dismissing their counterclaims for conversion, trespass to chattels, and unjust enrichment. Although all these claims have slightly different elements, all require some form of unlawful or unauthorized taking of Engines A and B. Defendants argue that
 

 Avantair removed the original [Defendants' Airplane] engines without authorization, and affixed them to [plaintiffs'] aircraft as the company began to become insolvent, presumably in order to save costs. The transfer of possession was not subject to a sale or any form of consideration through Avantair's program documents. Those engines are the original component parts to the [Defendants' Airplane] aircraft belonging to [defendants].
 

 Defendants also argue that "[a]s is the case with tires on an automobile, the original [Defendants' Airplane] engines did not become part of [Plaintiffs' Airplane] by virtue of their affixation thereto. In fact, aircraft
 
 *570
 
 engines can be quickly removed and swapped, in order to avoid delay and prolonged grounding. They too are easily identifiable and serialized, and can be removed without damaging the donee aircraft." Their argument focuses on "ownership" of the engines as opposed to the ownership of the plane as a whole and contends that plaintiffs have done something wrongful or unjust by keeping the engines that had been on Defendants' Airplane.
 

 According to defendants' argument, defendants own every part of Defendants' Airplane as it existed when it was originally acquired from the manufacturer by Avantair-engines, tires, seats, cup holders, and everything else-and each and every part that was on that plane must be returned to them because they own it. As the Eleventh Circuit noted in
 
 Avantair
 
 , defendants "invite[ ] us to resolve this variation on the Paradox of Theseus's Ship by answering a resounding 'yes' to [the question 'is your airplane now my airplane after my airplane's parts have been installed on yours?']"
 
 [6]
 

 In re Avantair
 
 ,
 
 Inc.
 
 ,
 
 638 F. App'x at 971
 
 . The
 
 *375
 
 Eleventh Circuit "decline[d the] invitation to drift into this philosophical turbulence," and so do we.
 
 Id
 
 . Whatever the answer to the Paradox of Theseus's Ship, the Avantair Program documents controlled the maintenance of the Avantair Program aircraft, so defendants have not shown that plaintiffs did anything unlawful, unauthorized, in bad faith, or inequitable by having the engines that had been on Defendants' Airplane at the moment Avantair was forced into bankruptcy. Avantair was performing its job as Manager-perhaps poorly, since it led to bankruptcy-in compliance with the Avantair Program documents by removing the engines from Defendants' Airplane for maintenance and by later installing them on Plaintiffs' Airplane. When bankruptcy was filed, the music stopped in Avantair's game of musical chairs-or musical engines-and defendants ended up without a chair. Defendants have not shown that plaintiffs acted in any way not authorized by the Avantair Program documents, so their counterclaims for conversion, trespass to chattels, and unjust enrichment must fail. The trial court did not err by denying defendants' motion for summary judgment and dismissing their counterclaims.
 
 *571
 

 Conclusion
 

 We affirm the trial court's order granting summary judgment for plaintiffs and denying defendants' request for summary judgment.
 

 AFFIRMED.
 

 Judges BRYANT and CALABRIA concur.
 

 [1]
 

 This aircraft was specifically identified in plaintiffs' Ownership Agreements "a Piaggio Avanti P-180, bearing tail number N132SL, together with engines, components, accessories, parts, equipment and documentation installed thereon or attached thereto or otherwise pertaining thereto." For ease of reading, we will simply call it "Plaintiffs' Airplane."
 

 [2]
 

 On 3 November 2014, the bankruptcy court granted plaintiffs relief from automatic stay and allowed them to proceed with this action.
 

 [3]
 

 Defendants' Airplane's original engines had been removed in 2007 to be overhauled, so those specific engines were not installed on Defendants' Airplane as of the dates on which some of the defendants purchased their fractional interests.
 

 [4]
 

 We will refer to the engines as Engine A and Engine B for ease of reading.
 

 [5]
 

 "Preventive maintenance means simple or minor preservation operations and the replacement of small standard parts not involving complex assembly operations." 14 CFR 1.1.
 

 [6]
 

 The Paradox of Theseus's Ship was first described by Greek historian Plutarch: "The ship wherein Theseus and the youth of Athens returned from Crete had 30 oars, and was preserved by the Athenians down even to the time of Demetrius Phalereus, for they took away the old planks as they decayed, putting in new and stronger timber in their places, in so much that this ship became a standing example among the philosophers, for the logical question of things that grow; one side holding that the ship remained the same, and the other contending that it was not the same." Plutarch, Theseus, as translated by John Dryden.