NFH, Inc. v. Troutman, 2019 NCBC 64.

STATE OF NORTH CAROLINA

IREDELL COUNTY

NFH, INC.,

       Plaintiff,

v.

JOSEPH H. TROUTMAN, III;
WILLIAM TROUTMAN; ABBI
TROUTMAN; SHELTON COOPER,
LLC; and TROUTMAN FUNERAL
HOME, INC.,

       Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
19 CVS 209

**ORDER AND OPINION ON
DEFENDANTS' MOTIONS TO
DISMISS ALL CLAIMS IN
PLAINTIFF'S AMENDED
COMPLAINT**

1.    **THIS MATTER** is before the Court on Defendants' Motions to Dismiss All Claims in Plaintiff's Amended Complaint (the "Motion") filed on May 28, 2019 by Defendants Joseph H. Troutman, III ("Joseph"); William Troutman ("William"); Abbi Troutman ("Abbi"); Shelton Cooper, LLC ("SC, LLC"); and Troutman Funeral Home, Inc. ("TFH, Inc.") (collectively, "Defendants"). (ECF No. 29.)

2.    This case involves a dispute between a funeral home in Iredell County and two of its former employees who left the funeral home and began running a competing funeral home located six miles away. The Amended Complaint asserts eight (8) claims in total, one of which was dismissed prior to the hearing on the Motion.[1] (*See* Am. Compl. 13–20, ECF No. 23 ["Am. Compl."].) Two of those claims are brought solely against Joseph: breach of contract (Count I), (Am. Compl. ¶¶ 75–84), and unjust

---

[1] Plaintiff voluntarily dismissed its conversion claim on June 10, 2019. (ECF No. 34.)

enrichment (Count VIII), (Am. Compl. ¶¶ 132–138); and three claims are brought against Joseph and William: misappropriation of trade secrets (Count II), (Am. Compl. ¶¶ 85–93), breach of fiduciary duty (Count IV), (Am. Compl. ¶¶ 100–10), and fraudulent concealment (Count VI), (Am. Compl. ¶¶ 120–26). As to all Defendants, the Amended Complaint brings claims for tortious interference with contract (Count V), (Am. Compl. ¶¶ 111–19), and unfair and deceptive trade practices (Count VII), (Am. Compl. ¶¶ 127–131). The Motion seeks dismissal of all seven (7) of Plaintiff's remaining claims.

3. For the reasons set forth herein, the Court **GRANTS in part** and **DENIES in part** the Motion.

*Bell, Davis & Pitt, P.A., by Marc E. Gustafson and Joshua B. Durham, for Plaintiff.*

*Eisele, Ashburn, Greene & Chapman, P.A., by Douglas G. Eisele, for Defendants.*

Robinson, Judge.

## I.   FACTUAL BACKGROUND

4. The Court does not make findings of fact on a motion to dismiss pursuant to Rule 12(b)(6) but only recites those factual allegations that are relevant and necessary to the Court's determination of the Motion.

### A.   The Parties

5. Plaintiff NFH, Inc. d/b/a Nicholson Funeral Home ("NFH" or "Plaintiff") is a North Carolina corporation with its principal office in Statesville, North Carolina.

(Am. Compl. ¶ 6.) Defendants Joseph, (Am. Compl. ¶ 7), William, (Am. Compl. ¶ 8), and Abbi, (Am. Compl. ¶ 8), are citizens and residents of Iredell County.

6. Joseph was a fifty percent (50%) owner of NFH with his then-wife, Pamela Strandburg ("Strandburg") from 1983 until 2003. (Am. Compl. ¶¶ 14–16.) For over thirty-five (35) years, Joseph served as NFH's Licensed Funeral Director, Vice President, Chairman of Operations, and President. (Am. Compl. ¶ 20.) In order to serve in these roles, Joseph met with customers and their families across Iredell County to discuss funeral services. (Am. Compl. ¶ 21.)

7. William is the son of Joseph and Strandburg. (Am. Compl. ¶¶ 8, 17.) William began working for NFH immediately after college and served in a number of roles at NFH over a thirteen (13) year period. (Am. Compl. ¶ 46.) William is listed in certain documents dated around 2003 as "Chairman of Operations." (Stock Purchase Agreement § 2.24, Ex. C to Am. Compl. ["SPA"].) As late as January 25, 2018, a listing of those authorized to conduct business for NFH indicates William was NFH's Treasurer. (Company Resolution, Ex. E to Am. Compl.) Plaintiff alleges that Joseph was "grooming" his son to take over his position with NFH and "introduced William to many of NFH's customers in order to further their personal relationship with the Troutman family." (Am. Compl. ¶ 21.)

8. Abbi is the wife of William, the daughter-in-law of Joseph, and, upon information and belief, is alleged to have been one of the purchasers of Troutman

Funeral Home,[2] a second funeral home operating in Iredell County located six miles from NFH. (Am. Compl. ¶¶ 60–61, 67.)

9.    SC, LLC and TFH, Inc. (collectively referred to as "TFH" in the Amended Complaint[3]) both have their principal offices and main corporate offices in Statesville, North Carolina. (Am. Compl. ¶¶ 6, 11.) Plaintiff alleges, upon information and belief, that William, Abbi, SC, LLC and/or TFH, Inc. purchased Troutman Funeral Home on December 13, 2018. (Am. Compl. ¶ 60.) Troutman Funeral Home, the purchased business, is a competitor of NFH, offering many of the same services that NFH offers, to the same customers. (Am. Compl. ¶ 67.)

**B.    NFH Stock Purchase and Subsequent Acquisition**

10.    In 1983, Strandburg and Joseph, then married, purchased NFH and operated it together as a funeral home for fifteen years, each owning one-half of the business. (Am. Compl. ¶¶ 14, 15.) The couple divorced in 1999 but maintained their equal ownership of NFH until 2003, when Joseph sold his interest to Strandburg, (Am. Compl. ¶ 16), in exchange for $800,000, (Am. Compl. ¶¶ 16, 37).

11.    The purchase of Joseph's stock in NFH was governed by the terms of a Stock Purchase Agreement (the "SPA") entered into and executed by and between Joseph,

---

[2] To complicate matters, "Troutman" is, among other things, the last name of three of the Defendants, the name of a town in Iredell County, North Carolina, the first word of a corporate entity founded by William (TFH, Inc.), and apparently the first word in the name of an unincorporated business (Troutman Funeral Home), a competing funeral home business also located in Iredell County.

[3] For the reasons set forth in Section IV.A below, the Court does not use the defined term "TFH" to refer to these two entities and instead separately sets out both entities as "TFH, Inc. and/or SC, LLC" anywhere the Amended Complaint references an action taken by "TFH."

Strandberg, and NFH on August 12, 2003. (SPA 1.) Section 4.02 of the SPA provided that Strandberg's purchase of Joseph's stock was conditioned upon Joseph "entering into an agreement containing a covenant on the part of [Joseph] that he will not compete, directly or indirectly, for himself or for others, with NFH or [Strandburg.]" (SPA § 4.02.) Also on August 12, 2003, Joseph and NFH executed an employment agreement (the "Employment Agreement"), which included, in addition to other post-employment restrictions, a covenant not to compete. (Employment Agreement ¶ 1, Ex. B. to Am. Compl. ["Emp. Agmt."].). Pursuant to the Employment Agreement, Joseph agreed to work as the Vice President and Chairman of Operations of NFH "for a term of five (5) years from [August 12, 2003]" – i.e., until August 11, 2008. (Emp. Agmt. ¶ 1.)[4]

12. Approximately thirteen years later, in or around 2016, negotiations between Strandburg and CMS East Acquisition Corp. ("CMS") regarding the sale of NFH began. (Am. Compl. ¶ 47.) Joseph and William were aware of these discussions and William himself presented a letter of intent to purchase NFH. (Am. Compl. ¶ 47.) However, in or about June 2018, CMS and NFH entered into a confidential letter of intent for CMS to purchase the stock of NFH. (Am. Compl. ¶ 47.) On or about December 14, 2018, CMS purchased all of the stock of NFH and became its present owner. (Am. Compl. ¶ 24.)

13. In addition to negotiating for the purchase of NFH, CMS submitted a letter of intent to the owners of Troutman Funeral Home in July 2018 in an effort to

---

[4] The relevant provisions of the SPA and the Employment Agreement are discussed in Section I.D below.

purchase that business as well, (Am. Compl. ¶ 47), but Troutman Funeral Home was ultimately purchased by William, Abbi, SC, LLC and/or TFH, Inc. on or about December 13, 2018. (Am. Compl. ¶¶ 49, 60.)

C. **NFH's Business, Confidential, Proprietary and Trade Secret Information**

14. NFH conducts a funeral home business throughout Iredell County, North Carolina, with many of its customers residing in Iredell County. (Am. Compl. ¶ 18.) According to Plaintiff, "[d]uring its more than a century of operation NFH has developed an incredible amount of goodwill" within the community. (Am. Compl. 19.) Most of NFH's customers come from families who have used NFH's services for multiple generations. (Am. Compl. ¶ 26.) NFH alleges that its business success and competitive position are dependent both on its confidential information and its trade secret information (which is largely its customer list) as well as its relationships and goodwill with its customers. (Am. Compl. ¶¶ 25, 26.)

15. The majority of this goodwill is furnished through NFH's customers' relationships with NFH's employees, which for many years included Joseph and William. (Am. Compl. ¶ 20.) William served as NFH's licensed insurance agent, licensed funeral director, and Treasurer, and Joseph served as its Licensed Funeral Director, Vice President, Chairman of Operations, and President, until they each resigned from NFH on December 12, 2018 and December 17, 2018, respectively. (Am. Compl. ¶ 20.) Plaintiff alleges that Joseph and William "had significant, if not exclusive, responsibility for the solicitation of customers, the execution of pre-arrangement contracts with those customers, and retention of NFH's customers."

(Am. Compl. ¶ 20.) NFH alleges it "pays and employs its personnel to create, maintain and strengthen its relationships with its customers." (Am. Compl. ¶ 27.) As a result, Joseph and William have "maintained a very close working relationship with many, if not all, of NFH's pre-arranged customers and many of their families." (Am. Compl. ¶ 34.)

16. NFH also alleges that it owns and maintains a "complete, comprehensive" customer database, containing information regarding the customer's pre-arrangement contract terms, specific customer needs, initial deposits, and insurance and banking information. (Am. Compl. ¶ 29.) The pre-arrangement contracts in NFH's customer database are contracts entered into between NFH and customers prior to a customer's death to pre-pay for burial and funeral costs. (Am. Compl. ¶ 18.) Although freely transferrable, Plaintiff alleges that these contracts have "material value" to NFH's business in part because they provide information regarding the types of products and services its customers may need in the future. (Am. Compl. ¶¶ 18, 29.) Plaintiff alleges that "a competitor with access to non-public information regarding these contracts could easily solicit these customers to transfer their business away from NFH." (Am. Compl. ¶ 18.)

17. NFH avers that the pre-arrangement contracts, NFH's business practices, other customer information, and business strategies are "among the principal assets of its business" and a competitor with access to this information would have an unfair advantage over NFH. (Am. Compl. ¶¶ 32, 34.) Access by a competitor to NFH's customer information "would drastically shortcut the sales process, eliminating the

need for a competitor to identify and cultivate potential customers." (Am. Compl. ¶ 34.) Plaintiff alleges that, given the way NFH develops its customer list and the time it takes to compile the list, "it would be impossible for anyone to duplicate a list of NFH's customers, or any significant portion of it, without access to that list." (Am. Compl. ¶ 35.)

18. NFH alleges the pre-arrangement contracts, community goodwill, and confidential customer information NFH had gained over time were key components in the company's valuation for the December 2018 sale to CMS. (Am. Compl. ¶ 24.)

19. NFH protects its confidential, proprietary, and trade secret information, which is not available to the public, in various ways and through reasonable measures. (Am. Compl. ¶ 31.) These measures include limiting access based on each employee's position and need for the information. (Am. Compl. ¶ 30.) NFH also requires all employees to execute non-disclosure agreements prohibiting misappropriation of NFH's customer list and other confidential information of NFH.[5] (Am. Compl. ¶ 31.)

### D. Joseph's Post-Employment Restrictions

20. As noted above, Joseph executed two contracts with NFH in 2003: the SPA and the Employment Agreement (together, the "Agreements"). (Am. Compl. ¶ 36.) NFH alleges that both Agreements, executed on the same day and which refer to each other, should be read together in determining the scope of Joseph's post-employment

---

[5] While NFH identifies and attaches to its Amended Complaint specific written agreements it entered into with Joseph, no written contracts between NFH and William are identified or attached to the Amended Complaint.

obligations and restrictions. (Am. Compl. ¶¶ 36, 38.) NFH alleges that there are essentially three categories of post-employment restrictions binding on Joseph as a result of his execution of the Agreements: (i) covenants not to disclose or use NFH's confidential information, (ii) a covenant not to solicit NFH's customers, and (iii) a covenant not to compete against NFH. (Am. Compl. ¶¶ 39–41.) The Court discusses each in more detail below.

21. First, Plaintiff alleges that, pursuant to the Agreements, Joseph was not to disclose or use any confidential information of NFH. (Am. Compl. ¶¶ 38, 39.) Paragraph 5 of the Employment Agreement provides that Joseph "will not, either during or after his employment with [NFH], disclose any Confidential Information of the company to any person outside the [c]ompany," nor "use any Confidential Information of the [c]ompany for any purpose other than the furtherance of [NFH's] business." (Emp. Agmt. ¶ 4(a).) Section 4.01 of the SPA provides that Joseph will "refrain from disclosure of any confidential or proprietary information concerning NFH . . . to any person, firm, corporation, association or other entity for any reason or purpose whatsoever, from making use of any such confidential or proprietary information for his own purpose or for the benefit of [anyone other than] NFH." (SPA § 4.01.) Neither of these provisions provide an expiration date to Joseph's obligations not to use or disclose NFH's confidential information.

22. Second, Plaintiff alleges that Joseph agreed "for a period of five (5) years after the termination of Joseph's employment with NFH" not to render any services to or solicit any business from anyone in Iredell County "with whom or for whom NFH

had done business or provided services during Joseph's employment." (Am. Compl. ¶ 40.) The Employment Agreement does not mirror NFH's allegations, stating instead that Joseph "will not render any services to, or solicit any business from, any person, firm, client, customer, or corporation located in Iredell County (whether in an employer-employee relationship or otherwise) with whom or for whom [NFH] has done business or provided services during the Employment Period [and for five (5) years thereafter]." (Emp. Agmt. ¶ 7.) The SPA does not contain a non-solicitation clause.

23. Third, Plaintiff alleges that Joseph agreed "for a period of five (5) years after the termination of his employment with NFH, not to compete for himself or for others against NFH in the funeral home business." (Am. Compl. ¶ 41.) In this regard, Paragraph 7 of the Employment Agreement provides that Joseph

> agrees not to compete, directly or indirectly, for himself or for others with [NFH or Strandburg] in any manner with respect to the funeral home business. This section shall not restrict the right of [Joseph] to own securities of any company listed on a national or regional stock exchange or traded in the over-the-counter market.

(Emp. Agmt. ¶ 7.)

24. Additionally, the SPA states that,

> [Joseph will provide] at closing as a condition to [Strandburg's] obligation to consummate the transaction, an agreement containing a covenant on the part of [Joseph] that he will not compete, directly or indirectly, for himself or for others, with NFH or [Strandburg] in the funeral home business for a period of five (5) years from the date of the conclusion of his employment with NFH at any location within Iredell County, North Carolina.

(SPA § 4.02.)

25. The non-compete clause and non-solicitation clause (together, the "Restrictive Covenants") in the Employment Agreement fall under the same internal heading "Noncompetition/Covenant Not to Compete" and exist for the same duration, which is "[d]uring the Employment Period and for five (5) years thereafter (or five years after earlier termination hereunder)." (Emp. Agmt. ¶ 7.) "Employment Period" is expressly defined in the Employment Agreement as "a term of five (5) years from [August 12, 2003]." (Emp. Agmt. ¶ 1.) Paragraph 1 of the Employment Agreement also provides that Joseph's employment is "subject to termination by [NFH] or either party pursuant to Section 6, hereof, which shall terminate the Employment period." (Emp. Agmt. ¶ 1.)

26. Both Restrictive Covenants are supported by payments in the total amount of $500,000, which are separate and apart from Joseph's employment salary, (*compare* Emp. Agmt. ¶ 7(b) with Emp. Agmt. ¶ 2(a)), and the purchase price for Joseph's shares, (SPA § 4.02). Plaintiff alleges that the $500,000 was to be paid in annual installments of $50,000 over a ten-year period (from 2003–2013). NFH further alleges that "[after the ten-year period], NFH paid Joseph monthly payments of one thousand dollars ($1,000.00) as continuing consideration . . . ." (Am. Compl. ¶ 42.) To support this allegation, Plaintiff attaches to the Amended Complaint copies of cancelled checks for these monthly payments for the year 2018. (Ex. D to Am. Compl.) Each of the bimonthly checks are made out to Joseph for $500. (Ex. D to Am. Compl. 1, 2.) The phrase "non compete" appears in the memo line of each of these checks. (Ex. D to Am. Compl.)

**E. Joseph's and William's Resignations from NFH and Alleged Wrongdoing**

27. On December 12, 2018, William resigned from employment with NFH. (Am. Compl. ¶ 59.) Five days later, on December 17, 2018, Joseph also resigned. (Am. Compl. ¶ 59.)

28. In the months leading up to William's resignation, Plaintiff alleges that William accessed NFH's computer system without authorization and gained access to confidential and proprietary information regarding the sale of NFH to CMS. (Am. Compl. ¶ 51.) Plaintiff also alleges that, based on a forensic analysis of William's computer, William downloaded NFH's confidential and proprietary information during that time. (Am. Compl. ¶ 52.)

29. Specifically, Plaintiff alleges that William downloaded NFH's pre-arrangement annual report, which contained a confidential list of every pre-arranged customer of NFH. (Am. Compl. ¶ 53.) It is unclear from the Amended Complaint whether downloading this company information was extraordinary or within the normal course of William's duties as an NFH employee. The Amended Complaint affirmatively alleges that, in his role with NFH, William, along with Joseph, "had significant, if not exclusive, responsibility for the solicitation of customers, the execution of pre-arrangement contracts with those customers and retention of NFH's customers." (Am. Compl. ¶ 20.)

30. Between August 30, 2018 and September 9, 2018, William also allegedly accessed and printed or copied confidential financial records of NFH without authorization. (Am. Compl. ¶ 55.)

31. Around this same time, William also allegedly transferred files from NFH to a Dropbox cloud storage account and two hard drives, including files related to "NFH's pre-arrangement agreements, customized forms, vendor lists, financial statements and insurance information." (Am. Compl. ¶ 56.)

32. On November 14, 2018, SC, LLC was organized as a North Carolina limited liability company. (Am. Compl. ¶ 57; Ex. F. to Am. Compl.) On December 6, 2018, TFH, Inc. was incorporated as a North Carolina corporation. (Am. Compl. ¶ 58; Ex. G. to Am. Compl.) The Articles for both entities filed with the North Carolina Secretary of State listed William as the initial registered agent. (Am. Compl. ¶¶ 57–58; Exs. F–G to Am. Compl.)

33. The Amended Complaint alleges, upon information and belief, that on December 13, 2018, William, Abbi, SC, LLC and/or TFH, Inc. purchased Troutman Funeral Home from its then-owners James and Susan Sappenfield and/or Sappenfield Funeral Home Services, Inc. (Am. Compl. ¶ 60.) Troutman Funeral Home, one of NFH's competitors, offers many of the same services as NFH and is located just under six miles from NFH. (Am. Compl. ¶ 67.) Joseph indicated in local newspaper articles that he intended to market and sell the same services at Troutman Funeral Home that he marketed and sold at NFH. (Am. Compl. ¶ 68.)

34. After William's resignation on December 12, 2018, William continued to access the website of one of NFH's vendors, Homesteader Life Company, which contained confidential information related to NFH's pre-arranged customers. (Am. Compl. ¶ 64.) This was done without NFH's authorization. (Am. Compl. ¶ 64.)

35.     Plaintiff calculates that its customers have transferred pre-arrangement contracts having a value of more than $140,000 from NFH to Troutman Funeral Home. (Am. Compl. ¶ 66; Ex. I to Am. Compl.[6]) Further, Plaintiff "anticipate[s] that [ ] many of NFH's customers will transfer their pre-arrangement contracts with NFH to Troutman Funeral Home, based upon the relationships [Joseph and William] developed with NFH's customers at NFH's time and expense and as a result of the goodwill developed by NFH." (Am. Compl. ¶ 72.)

36.     Plaintiff further alleges that "[Joseph and William's] competitive activities on behalf of [TFH] will inevitably lead to the disclosure of [NFH's] confidential information and its trade secrets[.]" (Am. Compl. ¶ 71.)

37.     Joseph and William have also allegedly hired away one of NFH's employees and have contacted at least three additional NFH employees in an attempt to hire them away. (Am. Compl. ¶ 73.)

## II.     PROCEDURAL BACKGROUND

38.     The Complaint initiating this matter was filed on January 28, 2019. (ECF No. 3.) On January 29, 2019, this case was designated as a mandatory complex business case by order of then-Chief Justice of the North Carolina Supreme Court Mark Martin and assigned to the undersigned that same day by order of the Chief Business Court Judge. (ECF No. 1, 2.) Thereafter, Defendants filed a combined answer and motion to dismiss. (ECF No. 8.) Upon an order of the Court making it clear that Defendants' filing did not conform to the requirements of BCR 7.2, (*see* ECF

---

[6] Exhibit I to the Amended Complaint, a spreadsheet of alleged pre-arrangement contracts, is filed under seal pursuant to North Carolina Business Court Rule ("BCR") 5.2.

No. 10), Defendants sought and obtained relief to withdraw the filing. (ECF Nos. 11, 14.)

39. A properly formatted motion to dismiss and brief in support were then both filed on March 4, 2019. (ECF Nos. 15, 16.) Following full briefing of the motion, a hearing was scheduled for May 16, 2019. (ECF No. 19.) On May 14, 2019, Plaintiff filed its Amended Complaint, (ECF No. 23), thereby mooting the March 4, 2019 motion to dismiss.

40. On May 28, 2019, Defendants filed the Motion and a brief in support. (ECF Nos. 29, 30.) On June 10, 2019, Plaintiff voluntarily dismissed its claim for conversion of intellectual property. (ECF No. 34.) After full briefing on the Motion, the Court held a hearing on July 24, 2019, at which all parties were represented by counsel.

41. The Motion is ripe for resolution.

## III.   LEGAL STANDARD

42. In ruling on a motion to dismiss a complaint pursuant to Rule 12(b)(6) of the North Carolina Rules of Civil Procedure, the Court reviews the allegations in the Complaint in the light most favorable to the plaintiff. *See Christenbury Eye Ctr., P.A. v. Medflow, Inc.*, 370 N.C. 1, 5, 802 S.E.2d 888, 891 (2017). The Court's inquiry is "whether, as a matter of law, the allegations of the complaint . . . are sufficient to state a claim upon which relief may be granted under some legal theory[.]" *Harris v. NCNB Nat'l Bank*, 85 N.C. App. 669, 670, 355 S.E.2d 838, 840 (1987). The Court accepts all well-pleaded factual allegations in the relevant pleading as true. *See*

*Krawiec v. Manly*, 370 N.C. 602, 604, 811 S.E.2d 542, 545 (2018). The Court is not required, however, "to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Good Hope Hosp., Inc. v. N.C. Dep't of Health & Human Servs.*, 174 N.C. App. 266, 274, 620 S.E.2d 873, 880 (2005) (citation omitted).

43.    Furthermore, the Court "can reject allegations that are contradicted by the documents attached, specifically referred to, or incorporated by reference in the complaint." *Moch v. A.M. Pappas & Assocs., LLC.*, 251 N.C. App. 198, 206, 794 S.E.2d 898, 903 (2016) (citation omitted). The Court may consider these attached or incorporated documents without converting the Rule 12(b)(6) motion into a motion for summary judgment. *Id.* (citation omitted).

44.    Our Supreme Court has noted that "[i]t is well-established that dismissal pursuant to Rule 12(b)(6) is proper when '(1) the complaint on its face reveals that no law supports the plaintiff's claim; (2) the complaint on its face reveals the absence of facts sufficient to make a good claim; or (3) the complaint discloses some fact that necessarily defeats the plaintiff's claim.'" *Corwin v. British Am. Tobacco PLC*, 821 S.E.2d 729, 736−37 (N.C. 2018) (quoting *Wood v. Guilford County*, 355 N.C. 161, 166, 558 S.E.2d 490, 494 (2002)). This standard of review for Rule 12(b)(6) is the standard our Supreme Court "uses routinely . . . in assessing the sufficiency of complaints in the context of complex commercial litigation." *Id.* at 737 n.7 (citations omitted).

## IV. ANALYSIS

### A. Claims Brought Against SC, LLC

45. As an initial matter, the Court addresses the claims brought against SC, LLC. Aside from appearing in the caption as a named defendant, SC, LLC is referenced again only in paragraphs 4 and 10 of the Amended Complaint. In paragraph 4, SC, LLC is combined with TFH, Inc. under the defined term "TFH." In that same paragraph, Plaintiff states that it brings the action against "TFH" as a result of "TFH's tortious interference with the Agreements" and "TFH's unfair and deceptive trade practices." (Am. Compl. ¶ 4.) In paragraph 10, Plaintiff alleges that SC, LLC is a North Carolina corporation. (Am. Compl. ¶ 10.)

46. While defined terms are typically a tool to increase readability, in this case combining SC, LLC and TFH, Inc. into a single defined term "TFH" in the Amended Complaint has only created confusion. This is especially so here, where "TFH" is also an acronym for Troutman Funeral Home, the funeral home which was allegedly purchased by William, Abbi, SC, LLC and/or TFH, Inc. on December 13, 2018. For example, paragraph 54 of the Amended Complaint states that "on August 30, 2018, [William] downloaded TFH's vendor list[,]" but it is not clear whether the vendor list is owned by Troutman Funeral Home, SC, LLC or TFH, Inc. All appear possible. Plaintiff also refers to the "Articles of Incorporation for TFH," which are attached to the Amended Complaint as Exhibit G. (Ex. G to Am. Compl.) Exhibit G, however, only refers to TFH, Inc. and not SC, LLC. (Ex. G to Am. Compl.) In fact, the Articles of Organization for SC, LLC appear separately as Exhibit F to the Amended

Complaint. (Ex. F to Am. Compl.) This confusion continues throughout the Amended Complaint as there are numerous instances where the incorporated documents make clear that an allegation asserted by "TFH" could only have been advanced by SC, LLC or by TFH, Inc., but not both. In short, through its choice of defined terms, it is impossible to discern what NFH contends SC, LLC's role was in causing the harm alleged by Plaintiff. Certainly neither of the two allegations specifically mentioning SC, LLC makes out a cognizable claim for relief against it. (*See* Am. Compl. ¶¶ 4, 10.)

47. At the July 24, 2019 hearing on the Motion, the Court asked Plaintiff's counsel about this lack of clarity regarding SC, LLC's alleged role in the alleged misconduct. Counsel for Plaintiff, in full candor to the Court, responded that Plaintiff believed in good faith that SC, LLC was involved in Troutman Funeral Home in some capacity, but could not provide more details regarding its involvement until discovery ensued.

48. Even considering the liberal pleading standard embraced by our courts, in this case the Court does not believe that Plaintiff has provided sufficient allegations to put SC, LLC on notice of the claims against it. *See Plasman ex rel. Bolier & Co. v. Decca Furniture (USA), Inc.*, 811 S.E.2d 616, 621 (N.C. Ct. App. 2018) ("Under the notice theory of pleading a complainant must state a claim sufficient to enable the adverse party to understand the nature of the claim, to answer, and to prepare for trial . . . . While the concept of notice pleading is liberal in nature, a complaint must nonetheless state enough to give the substantive elements of a legally recognized

claim or it may be dismissed under Rule 12(b)(6)." (internal citations and quotation marks omitted)). Accordingly, all claims brought against SC, LLC should be dismissed.

49. Notwithstanding the Court's conclusion that the claims against SC, LLC should be dismissed, "[t]he decision to dismiss an action with or without prejudice is in the discretion of the trial court[.]" *First Fed. Bank v. Aldridge*, 230 N.C. App. 187, 191, 749 S.E.2d 289, 292 (2013). The Court concludes, in the exercise of its discretion, that Plaintiff's claims against SC, LLC should be dismissed without prejudice to Plaintiff's right to attempt to reassert such claims through proper factual allegations by way of a motion to amend if discovery discloses a good faith basis for making such claims.

50. In contrast to SC, LLC, the Court concludes that the allegations against TFH, Inc.—the other half of the "TFH" defined term—are otherwise sufficiently specific. Reading the allegations in the light most favorable to Plaintiff, there are more facts that logically implicate TFH, Inc.'s involvement in the activity complained of by Plaintiff. Accordingly, the Court does not dismiss the claims brought against TFH, Inc. for this reason.

**B.    Count I: Breach of Contract (Joseph)**

51. Plaintiff alleges that Joseph breached the Agreements by violating the post-employment terms contained therein. (Am. Compl. ¶ 80.) Specifically, Plaintiff asserts that Joseph violated those terms by rendering services to or soliciting

business from NFH's customers, (Am. Compl. ¶ 81), and by competing "with NFH for himself and on behalf of [Troutman Funeral Home,]" (Am. Compl. ¶ 82).

52.     To properly plead a breach of contract claim, a plaintiff need only allege "(1) [the] existence of a valid contract and (2) [a] breach of the terms of that contract." *Poor v. Hill*, 138 N.C. App. 19, 26, 530 S.E.2d 838, 843 (2000). Here, Plaintiff has alleged the existence of a valid contract. (*See* Am. Compl. ¶¶ 36–45.) In fact, Plaintiff has alleged there are two valid contracts between Joseph and NFH: the Employment Agreement and the SPA. (Am. Compl. ¶ 36.) While not necessary to sufficiently allege this first element, Plaintiff has attached the Agreements as exhibits to the Amended Complaint, and therefore the Court considers them when determining the sufficiency of Plaintiff's allegations. *See Moch*, 251 N.C. App. at 206, 794 S.E.2d at 903. Nothing raised in the Motion or noted by the Court on its own review of the incorporated documents suggests that these Agreements are not valid Agreements to which Joseph is a party.[7] Accordingly, the Court must consider whether Plaintiff has adequately alleged a breach of the Agreements.

53.     Here, Plaintiff's breach of contract claim encompasses all of Joseph's "post-employment terms." (Am. Compl. ¶ 80.) As set forth in the general factual allegations of the Amended Complaint, these obligations can be divided into three categories: (1) covenants not to use or disclose confidential information, (Emp. Agmt. ¶ 4; SPA § 4.01); (2) covenants not to solicit customers or employees, (Emp. Agmt. ¶ 7); and (3)

---

[7] For the reasons discussed below, however, the Court concludes that the Restrictive Covenants within the Agreements are unenforceable. Given that this conclusion does not invalidate the Agreements in their entirety, the Court undertakes this analysis under the "breach" prong of this claim.

a covenant not to compete, (Emp. Agmt. ¶ 7; *see also* SPA § 4.02). The Court addresses the latter two categories first and then the confidentiality provisions.

**1.     A Claim for Breach of the Restrictive Covenants is Barred Based on the Express Language in the Employment Agreement**

54.     Upon review of the Employment Agreement, and the specific post-employment provisions contained therein, the Court concludes that Plaintiff's breach of contract claim premised on the Restrictive Covenants is fatally defective and should be dismissed because these covenants, to the extent they might otherwise be enforceable, expired by their very terms long before Joseph left NFH in December 2018.

55.     Plaintiff alleges that the Agreements, when read together, indicate that Joseph's post-employment obligations began to run when he stopped working for NFH in December 2018, and therefore the Restrictive Covenants prohibit Joseph from competing with NFH or soliciting NFH's customers to transfer their business to Troutman Funeral Home from December 2018 through and including December 2023.

56.     However, the language in the Employment Agreement in Section 7, where the Restrictive Covenants appear, is unambiguous and at odds with Plaintiff's interpretation. Section 7 provides that the Restrictive Covenants continue "[d]uring the Employment Period and for five (5) years thereafter[.]" As noted above, "Employment Period" is a defined term in the Employment Agreement, appearing in Paragraph 1, and is specifically and expressly defined as "a term of five (5) years from

the date hereof[.]" The "date hereof" is August 12, 2003—the date on which the Employment Agreement was executed and took effect. (*See* Emp. Agmt. 1.)

57. Therefore, based on the unequivocal language of the Employment Agreement, the post-employment Restrictive Covenants therein began to run on August 12, 2008, the date on which the Employment Period ended by its terms, and continued through and including August 11, 2013. Since there is no allegation in the Amended Complaint that Joseph began his alleged misconduct before 2018, over five years after the expiration of the Restrictive Covenants, such conduct cannot properly be the basis for the breach of the Restrictive Covenants.

58. Plaintiff argues that it would be contrary to the "intent" of the Employment Agreement to read the Restrictive Covenants as having started to run in 2008 when Joseph was still employed with NFH. In support of this argument, Plaintiff contends that the SPA exists for a longer duration than the Employment Agreement because it is not keyed to a definite "Employment Period" and therefore its language supports the imposition of post-employment obligations through 2018 and five years thereafter.

59. The problem with Plaintiff's argument is that the SPA, by its express terms, does not create a restrictive covenant, but rather states that, at the closing of the stock sale by Joseph, Joseph *would execute such an agreement*. (SPA § 4.02.) The allegations of the Amended Complaint, and the documents attached thereto make clear that rather than creating a non-compete in the SPA, the parties included a non-competition covenant as a part of the simultaneously-executed Employment

Agreement that has a specific—and, as analyzed in Section IV.B.2 below, unenforceable—non-compete provision.

60.     The Court cannot look to a separate agreement, with a distinct purpose, to determine the intent of the parties to an unambiguous contract with an entirely different purpose. [8] *See Anderson v. Anderson*, 145 N.C. App. 453, 458, 550 S.E.2d 266, 269 (2001) ("It is a well-settled principle of legal construction that it must be presumed the parties intended what the language used clearly expresses, and the contract must be construed to mean what on its face it purports to mean."). And regardless of Plaintiff's post-hoc argument regarding the parties' intent, the language of the Employment Agreement is clear and unambiguous and controls the Court's decision. *Press v. AGC Aviation, LLC*, 818 S.E.2d 365, 371 (N.C. Ct. App. 2018) ("The parties selected the language of the contract. Finding it to be clear and unambiguous, we have no right—nor did the lower court—to give it a meaning other than that expressed in it. To hold otherwise would be to do violence to the most fundamental principle of contracts." (quoting *Hamilton Constr. Co. v. Bd. of Pub. Instruction of Dade Cty.*, 65 So.2d 729, 731 (Fla. 1953))).

61.     Based on the plain reading of the Employment Agreement, Joseph no longer had a valid and binding written employment agreement with NFH after 2008. Nothing in the Employment Agreement indicates that its term was extended if

---

[8] Even if it could, the Court is not convinced that the language in the SPA supports Plaintiff's position that the parties' intent was for the non-compete to run from 2003 through 2023. Because the SPA is silent as to how long Joseph was to be employed—as that agreement was not executed for that purpose—it is entirely consistent that the parties meant the phrase "from the date of the conclusion of his employment with NFH[,]" (SPA § 4.02), to mean the five-year employment term as defined in the Employment Agreement.

Joseph continued to work at NFH after 2008. In fact, the Employment Agreement says the exact opposite: it provides that if any provision of the Employment Agreement was to be amended, "such amendment shall require an additional writing or agreement, so as to cause this [Employment] Agreement to be valid and enforceable to the fullest extent permitted by law." (Emp. Agmt. ¶ 8(b).)

62. Plaintiff has not alleged that Joseph entered into a new employment agreement with new Restrictive Covenants. Plaintiff instead argues that NFH and Joseph extended the period for the Restrictive Covenants[9] when NFH wrote Joseph bi-monthly checks for $500 with the memo line "non compete[,]" which Joseph cashed. Although not clear when Joseph first started receiving these checks, the cancelled checks attached to the Amended Complaint indicate Joseph was receiving them throughout 2018. (*See* Ex. D to Am. Compl.) Plaintiff argues that these bi-monthly payments were consideration for an extension of the period of the Restrictive Covenants.

63. There are two problems with this argument. First, the law is clear that a valid non-compete and/or non-solicitation clause must be part of an employment agreement. *United Labs., Inc. v. Kuykendall*, 322 N.C. 643, 649–50, 370 S.E.2d 375, 380 (1988). Here, even reading the Amended Complaint in the light most favorable to Plaintiff, there was no employment agreement after 2008. Second, the cancelled checks themselves cannot constitute a validly written non-compete and/or non-

---

[9] Plaintiff broadly refers to the non-solicitation clause and the non-compete covenant together as the "non-compete" because both appear in Section 7 in the Employment Agreement, entitled "Noncompetition/Covenant Not to Compete."

solicitation clause, as the time, territory, or restrictions upon Joseph are not expressed on the checks nor is there any language on the checks expressing an intention that their delivery and negotiation by Joseph effectively extended the period of the Restrictive Covenants.

64. Accordingly, the Court is unpersuaded by Plaintiff's argument that Joseph's Restrictive Covenants extended through the period of the allegedly wrongful conduct complained of in the Amended Complaint. Because there can be no breach of contract claim premised on Joseph's breach of the Restrictive Covenants, Plaintiff's first claim must be dismissed to the extent it is based on an alleged breach of the Restrictive Covenants.

**2.    Even if Plaintiff's Claim as to the Restrictive Covenants was not Barred Because the Restrictive Covenants' Terms Have Expired, They are Overly Broad and Unenforceable**

65. Assuming *arguendo* that the Agreements extended through and beyond 2018 as Plaintiff alleges, the Court concludes that Plaintiff's breach of contract claim premised on the Restrictive Covenants must be dismissed for the additional reason that the covenants are overly broad and unenforceable on their face.[10] The language

---

[10] Though not raised by the parties in their respective briefing on the Motion, the Court addresses Paragraph 8(b) of the Employment Agreement which provides, in relevant part, that "[t]he parties hereto agree that this covenant not to compete is reasonable as to . . . duration, geographic area and nature of the business protected." (Emp. Agmt. ¶ 8(b).) The Court is not bound by the parties' representation that a covenant is reasonable. *See Johnston County v. R. N. Rouse & Co.*, 331 N.C. 88, 95, 414 S.E.2d 30, 34 (1992). In a related context, our Supreme Court has expressly concluded that the parties cannot include provisions in their non-competes to circumvent the Court's limitations on enforcing unreasonable covenants. *See Beverage Sys. of the Carolinas, LLC v. Associated Bev. Repair, LLC*, 368 N.C. 693, 699–700, 784 S.E.2d 457, 461–62 (2016) (concluding that the court cannot rewrite an unreasonable non-compete even where the parties expressly provide therein that the court can revise the non-compete to be reasonable). Accordingly, the Court considers the

evidencing the Restrictive Covenants in the Employment Agreement reads, in relevant part, as follows:

> 7.     *Noncompetition/Covenant Not to Compete*
> (a)  During the Employment Period and for five (5) years thereafter (or five years after earlier termination hereunder), the Employee agrees that he will not render services to, or solicit any business from, any person, firm, client, customer, or corporation located in Iredell County (whether in an employer-employee relationship or otherwise) with whom or for whom the Company has done business or provided services during the Employment Period. Further, Employee agrees not to compete, directly or indirectly, for himself or for others with the Company or the Purchaser in any manner with respect to the funeral home business. This section shall not restrict the right of the Employee to own securities of any company listed on a national or regional stock exchange or traded in the over-the-counter market.

66.     Although, in part, the non-solicitation clause and non-compete are separated by punctuation in Paragraph 7 of the Employment Agreement, both clauses share the same time and territory perimeters: "[d]uring the Employment Period and for five (5) years thereafter (or five years after earlier termination[.])" (Emp. Agmt. ¶ 7.)  Further, both are supported by the same consideration ($500,000). (Emp. Agmt. ¶ 7(b).)  In fact, the two clauses are not even set forth in separate paragraphs, but rather their terms (other than the amount of consideration) are set forth together in Paragraph 7(a) of the Employment Agreement.

67.     As this Court has recognized, the "elements are the same for non-competition and non-solicitation clauses[.] *Akzo Nobel Coatings, Inc. v. Rogers*, 2011 NCBC LEXIS 42, at *31 (N.C. Super. Ct. Nov. 3, 2011).  To be enforceable under North Carolina law, non-competition and non-solicitation clauses between an

---

reasonableness of the covenants regardless of this representation in Paragraph 8(b) of the Employment Agreement.

employer and employee must be: "(1) in writing; (2) made part of a contract of employment; (3) based on valuable consideration; (4) reasonable both as to time and territory; and (5) not against public policy." *Kuykendall*, 322 N.C. at 649–50, 370 S.E.2d at 380.

68. Our Courts have recognized that an employer has a legitimate interest in protecting "customer relationships and goodwill against misappropriation from departing employees." *Id.* at 651, 370 S.E.2d at 381. However, "[t]he restrictions . . . must be no wider in scope than is necessary to protect the business of the employer." *Manpower of Guilford Cty., Inc. v. Hedgecock*, 42 N.C. App. 515, 521, 257 S.E.2d 109, 114 (1979). Restrictive covenants are overbroad, and therefore unenforceable, in this State when they "prohibit the employee from engaging in future work that is distinct from the duties actually performed by the employee[,]" *Medical Staffing Network, Inc. v. Ridgeway*, 194 N.C. App. 649, 656, 670 S.E.2d 321, 327 (2009), or "impose unreasonable hardship on the [employee,]" *CopyPro, Inc. v. Musgrove*, 232 N.C. App. 194, 200, 754 S.E.2d 188, 192 (2014) (citation omitted). "In deciding what is reasonable [as to scope of business interests protected, geographic area, and time], the court looks to the facts and circumstances of the particular case." *See Mkt. Am., Inc. v. Lee*, 809 S.E.2d 32, 40 (N.C. Ct. App. Dec. 19, 2017).

69. North Carolina has adopted a "strict blue pencil doctrine" wherein a court cannot rewrite an unenforceable covenant; instead, to avoid scrapping an entire covenant, a Court may enforce the divisible parts of a covenant that are reasonable. *Bev. Sys. of the Carolinas*, 368 N.C. at 696, 784 S.E.2d at 460.

70.     Here, the Court is required on this Motion to consider the enforceability of the Restrictive Covenants in both the Employment Agreement and the SPA. Notwithstanding Plaintiff's allegations that both Agreements contain such covenants, the Court notes that only the Employment Agreement has a non-solicitation clause. Moreover, the language potentially evidencing a non-compete in Section 4.02 of the SPA is insufficient to be considered an enforceable non-compete. As noted previously, that Section merely proscribes that, at closing of the stock sale, Joseph was to execute a non-compete agreement. Joseph fulfilled this condition by executing the Employment Agreement, and specifically Section 7 of the Employment Agreement, which contains both a non-solicitation clause and non-competition clause. Therefore, the Court focuses its analysis on Section 7 of the Employment Agreement, and specifically, whether the Restrictive Covenants therein are reasonable as to time and scope.

71.     Turning first to the language evidencing a non-solicitation clause, Section 7 prevents Joseph during the Employment Period and for five years thereafter from rendering any services to or soliciting business from anyone with whom or for whom NFH did business during Joseph's employment.

72.     While the elements of a non-solicitation clause are identical to a non-compete clause, North Carolina courts are generally more willing to enforce a non-solicitation clause targeted to a former employer's customers or prospective customers than provisions completely prohibiting a former employee from working for certain employers or in certain regions. *Sandhills Home Care, L.L.C. v.*

*Companion Home Care – Unimed, Inc.*, 2016 NCBC LEXIS 61, at \*27 (N.C. Super. Ct. Aug. 1, 2016).

73.     In *Sandhills*, Judge McGuire of this Court considered a non-solicitation clause that restricted former employees from soliciting any of their former employer's customers, regardless of whether the employee had contact with that customer. *Id.* at \*29. There, the duration of the non-solicitation clause was one year and all of the employer's customers were located in and around Robeson County, North Carolina. *Id.* Considering the relatively short duration of the restriction, and that the employer had "a relatively small and easily identified set of customers[,]" the Court could not conclude on a 12(b)(6) motion that the non-solicitation restriction was unreasonable as a matter of law "simply because it prohibited [the former employees] from soliciting customers with whom they may not have had personal contact during [their] employment." *Id.* at \*27–29.

74.     Our appellate courts have also enforced non-solicitation clauses where the restrictions were not limited to clients or customers with whom the employee had direct contact. *See Triangle Leasing Co. v. McMahon*, 327 N.C. 224, 229, 393 S.E.2d 854, 857–58 (1990) (concluding that the restriction that prevented the employee from soliciting the company's customers was reasonable); *see also Wade S. Dunbar Ins. Agency, Inc. v. Barber*, 147 N.C. App. 463, 469, 556 S.E.2d 331, 335–36 (2001).

75.     Like in *Sandhills*, NFH alleges here that it operates in a relatively small geographic area: Iredell County. Moreover, Plaintiff has affirmatively alleged that Joseph "maintained a very close working relationship with many, if not all, of NFH's

pre-arranged customers and many of their families." (Am. Compl. ¶ 34.) In this regard, therefore, it is not facially unreasonable to prevent someone in Joseph's position—who was, for all intents and purposes, the face of the company—from soliciting all of NFH's pre-arranged customers.

76. However, the non-solicitation clause is not just limited to NFH's pre-arranged customers, and it is this fact that separates the case at bar from *Sandhills* and the appellate cases cited above. In each of those cases, the non-solicitation clauses were limited to the solicitation of the employer's *customers*. Here, by contrast, Joseph is prevented from rendering "any" services or soliciting "any" business from anyone for whom or with whom NFH has done business (whether in an employer-employee relationship or otherwise) at any time during the restrictive period. Pursuant to the language of this non-solicitation clause language, Joseph would be prevented from contacting any customer or vendor—from the janitor to the payroll administrator—for any purpose at all, even those unrelated to the provision of funeral home services.

77. And, as noted above, since the non-solicitation period defined by the term "Employment Period" means from August 12, 2003 through August 11, 2008, the non-solicitation clause would reach back as much as fifteen (15) years, preventing Joseph from contacting a customer or vendor/supplier who did business with NFH as early as 2003. *See Farr Assoc., Inc. v. Baskin*, 138 N.C. App. 276, 280, 530 S.E.2d 878, 881 (2000) (declaring that when a restrictive covenant "reaches back to include clients of the employer during some period in the past, that look back period must be added to

the restrictive period to determine the real scope of the time limitation"). This language is simply too broad and far-reaching. *See Sterling Title Co. v. Martin*, 831 S.E.2d 627, 633 (N.C. Ct. App. 2019) (concluding that an agreement preventing the defendant from soliciting or providing competitive services to any of the plaintiff's customers with whom the defendant had contact during her ten-year employment and one year thereafter was "in essence an 11-year restriction" and was "patently unreasonable"). For these reasons, therefore, the Court believes that the non-solicitation clause is unreasonably broad and therefore unenforceable.

78. The Court further concludes that the non-compete provision is likewise unreasonably broad. Here, the non-compete provides, in relevant part, that Joseph "agrees not to compete, *directly or indirectly*, for himself or for others with [NFH] or [Strandburg] in any manner with respect to the funeral home business" for a period of five years after the end of the Employment Period. (Emp. Agmt. ¶ 7 (emphasis added).) Our courts have routinely found that language preventing a former employee from working "indirectly" with a competitor, is overbroad and not enforceable. *See Outdoor Lighting Perspectives Franchising v. Harders,* 228 N.C. App. 613, 628, 747 S.E.2d 256, 267 (2013) (finding unenforceable a non-compete restricting franchisee from having any involvement in any business "operating in competition with an outdoor lighting business" or any business "similar" to the franchisee's as it went "well beyond the prohibition of activities that would put [franchisee] in competition with [franchisor]"); *VisionAIR, Inc. v. James*, 167 N.C. App. 504, 508–09, 606 S.E.2d 359, 362–63 (2004) (concluding that a non-compete is

unreasonably broad where it prevents an employee from working "indirectly" for a competitor because it would prevent the employee "from doing even wholly unrelated work at any firm similar to [the employer]"); *CNC/Access, Inc. v. Scruggs*, 2006 NCBC LEXIS 22, at *24 (N.C. Super. Ct. Nov. 17, 2006) (holding that a provision restricting an employee from competing "directly or indirectly" was greater than necessary to protect a legitimate business interest of the employer).

79.     Moreover, the non-compete extends for a period of five years after the end of the employment period in the Employment Agreement, thereby also making the non-compete extend to what our courts have considered the "outer boundary" [11] of reasonableness.  *Farr Assocs., Inc.*, 138 N.C. App. at 280, 530 S.E.2d at 881; *see also Eng'g Assocs., Inc. v. Pankow*, 268 N.C. 137, 139, 150 S.E.2d 56, 58 (1966) ("[I]n some instances and under extreme conditions five years would not be held to be unreasonable.").

80.     Plaintiff contends that whether or not a restrictive covenant is reasonable is a question that cannot be ordinarily resolved on a Rule 12(b)(6) motion.  In support,

---

[11] Although in the sale of business context our courts have upheld five-year or longer restrictive covenants, the Court is confronted with a more complicated factual scenario here. While originally the non-compete was executed in connection with Joseph's sale of his shares in NFH, that sale occurred in 2003.  At the time of the misconduct alleged, Joseph had not been an owner of NFH for over fifteen (15) years.  Therefore, even if the Court were to read the Employment Agreement as Plaintiff intends—that the five year non-compete period began to run in 2018 after Joseph left his employment with NFH—the Court believes it can hardly consider this non-compete as made in connection with the sale of his shares that occurred fifteen years prior to his departure from the company.  Joseph, when entering into the Agreements, did not agree to a non-compete for fifteen (15) or more years in connection with the sale of his shares.  He agreed to a five (5) year term.  Therefore, the Court distinguishes the facts of this case from those cases considering the reasonableness of non-competes in the sale of business context. *Cf. Jewel Box Stores Corp. v. Morrow*, 272 N.C. 659, 663, 158 S.E.2d 840, 843 (1968).

Plaintiff points to *Market America, Inc. v. Lee*, in which the Court of Appeals stated that, "a ruling on the enforceability of [a non-compete] agreement cannot be made at the pleading stage in cases where evidence is needed to show the reasonableness of the restrictions contained therein." *Mkt. Am., Inc.*, 809 S.E.2d at 41. The court in *Market America* relied on its earlier decision in *Okuma America Corp. v. Bowers*, where the duration of the covenant not to non-compete was six months and prevented the employee from working for a direct competitor in "areas in which [the employee did] business." *Okuma Am. Corp. v. Bowers*, 181 N.C. App. 85, 87–88, 638 S.E.2d 617, 619 (2007). The *Okuma* Court held that "the six-month period was 'well within the established parameters for covenants not to compete in this State' and that although 'the geographic effect of the restriction is quite broad . . . taken in conjunction with the six-month duration, it is not per se unreasonable . . . .'" *Mkt. Am., Inc.*, 809 S.E.2d at 41 (quoting *Okuma*, 181 N.C. App. at 90, 638 S.E.2d at 630).

81. Here, however, the Court concludes that the Restrictive Covenants in the Employment Agreement are *per se* unreasonable. Unlike *Okuma*, where the covenant's territory and coverage of competing activities limitation was for a relatively short duration, here (for the reasons noted above in paragraphs 71–79) the Restrictive Covenants are overbroad *and* extend well past the outer boundary of reasonableness as to time period. Accordingly, the Court concludes that the facts of

*Okuma* are distinguishable from the case at bar and that the Restrictive Covenants are properly determined to be unreasonably broad and unenforceable.

82. Having so concluded, the Court determines that, even if the governing time period regarding the Restrictive Covenants had not expired prior to 2018, the Court could not use the blue pencil doctrine to enforce either the non-solicitation clause or the non-compete clause because neither covenant could be made reasonable without this Court re-writing the scope of the activity covered by the covenants. *See Beverage Sys. of the Carolinas*, 368 N.C. at 699, 784 S.E.2d at 461 ("[W]hen an agreement not to compete is found to be unreasonable, . . . the Court is powerless unilaterally to amend the terms of the contract." (citation omitted)). Here, the Court cannot remedy either covenant by striking out certain words because the problem with the Restrictive Covenants is that the language used itself is overly broad, and the Court cannot choose different words to give the covenants a more defined scope. *See Window Gang Ventures, Corp. v. Salinas*, 2019 NCBC LEXIS 24, at *22–23 (N.C. Super. Ct. April 2, 2019). Therefore, assuming *arguendo* that the Restrictive Covenants are not barred by the expiration of their term, they nonetheless are overly broad and unenforceable as a matter of law. Accordingly, the Motion is GRANTED as to Plaintiff's breach of contract premised on claimed breaches by Joseph of the two Restrictive Covenants in the Employment Agreement.

### 3. Plaintiff's Breach of Contract Claim is Supported by its Factual Allegations Regarding Joseph's Breach of the Confidentiality Provisions in the Agreements

83. Although the Court concludes that Plaintiff's breach of contract claim cannot be based on one or more alleged breaches by Joseph of the Restrictive Covenants, Plaintiff's breach of contract claim is expressly premised on all of Joseph's "post-employment terms[.]" The Court therefore must evaluate whether there are any other "post-employment terms" set forth in the Amended Complaint and in the Agreements that were in effect at the time of Joseph's alleged wrongdoing. Reading the Amended Complaint in the light most favorable to Plaintiff, and considering the language in the Agreements, the Court concludes that the confidentiality provisions in both Agreements binding Joseph are not limited to an employment term plus five (5) years that prevented him—at any time during his employment or afterwards—from disclosing or using NFH's confidential information. (Emp. Agmt. ¶ 4(a); SPA § 4.01.) Accordingly, finding that these provisions were in effect through 2018,[12] the Court must consider whether Plaintiff has adequately alleged a breach of contract claim premised on breach of the confidentiality provisions in the Employment Agreement and/or SPA.

---

[12] By definition, a claim for breach of a covenant preventing disclosure of confidential information must be based on facts supporting the argument that: (1) the information the defendant possessed was "confidential"; and (2) the defendant improperly disclosed it. *See Barbarino v. Cappuccine, Inc.*, 2012 N.C. App. LEXIS 305, at *6–8 (N.C. Ct. App. Mar. 6, 2012). Whether the information alleged by NFH to have been improperly disclosed by Joseph was in fact confidential cannot be determined by the Court at this stage of the proceeding.

84. Other than alleging broadly that Joseph breached his "post-employment terms[,]" Plaintiff does not allege within its first claim for relief that Joseph breached the Agreements by disclosing NFH's confidential information.

85. Notwithstanding that fact, Plaintiff does "re-allege the allegations of the foregoing paragraphs" of the Amended Complaint in its first claim for relief, (Am. Compl. ¶ 75), and therefore the Court considers those other allegations in evaluating this claim. Several times Plaintiff alleges that the Agreements provided that Joseph would not "disclose or use any confidential information of NFH" during or after his employment with NFH. (Am. Compl. ¶¶ 38–39.) This allegation is supported by the Agreements themselves, each of which provides that Joseph agreed not to disclose any of NFH's confidential information to any person outside of NFH or use the information for any purpose other than in furtherance of the NFH's business. (Emp. Agmt. ¶ 4(a); SPA § 4.01.) Confidential information is defined specifically in the Employment Agreement to include, among other things, "information used by or in the possession of the Company that relates to . . . customers[,]" (Emp. Agmt. ¶ 4(b)), and more generally in the SPA as "all information, which is known only to [Joseph] in a confidential relationship with NFH and/or [Strandburg,]" (SPA § 4.01). Moreover, Plaintiff has specifically alleged that NFH's customer list is part of its confidential information and that NFH's customer information is one of the "principal assets of its business." (Am. Compl. ¶ 32.)

86. As to breach of this specific covenant, the Court first notes that Plaintiff alleges Joseph's involvement with TFH, Inc. "will inevitably lead to the disclosure of

NFH's confidential information." (Am. Compl. ¶ 71.) An allegation of "inevitable disclosure", however, is not enough to support a breach of contract claim. *See DSM Dyneema, LLC v. Thagard*, 2015 NCBC LEXIS 50, at *16 (N.C. Super. Ct. May 12, 2015). There must actually be a breach of the agreement based on improper disclosure before such a claim can be brought. *See Penley v. Penley*, 314 N.C. 1, 20, 332 S.E.2d 51, 62 (1985) (concluding that a claim for breach of contract begins to accrue once the promise has been broken).

87. Plaintiff also alleges that William accessed NFH's confidential information without authorization and that, thereafter, this information was used by both William and Joseph to operate Troutman Funeral Home. (Am. Compl. ¶¶ 52–56, 64.) Specifically, after alleging that William downloaded, copied, and otherwise accessed NFH's confidential information without authorization from NFH, Plaintiff alleges that "William and Joseph are using [that] information . . . in the operation of TFH and specifically to solicit NFH's customers." (Am. Compl. ¶ 65.) Plaintiff has clearly alleged that information regarding NFH's customers is considered NFH's confidential information. Therefore—regardless of who downloaded the information—Joseph's alleged use of that information, for his and TFH's benefit, is sufficient for purposes of alleging a breach of contract claim against Joseph for violation of Paragraph 4 of the Employment Agreement and Section 4.01 of the SPA. The Court therefore concludes that Plaintiff's breach of contract claim is sufficiently pled as to Joseph's breach of the confidentiality provisions in the Agreements. Accordingly, the Motion is DENIED to the extent it seeks dismissal of this claim on that ground.

88. In summary, Plaintiff's claim for breach of contract may proceed as it relates to Joseph's alleged breach of the confidentiality provisions of the Agreements but is dismissed as to Joseph's alleged breaches of the Restrictive Covenants.

## C. Count II: Misappropriation of Trade Secrets (Joseph and William)

89. Plaintiff's second claim for relief is based on both Joseph's and William's alleged trade secret misappropriation. (Am. Compl. ¶¶ 85–93.) A claim for misappropriation of trade secrets is a cause of action codified in the North Carolina Trade Secrets Protection Act. N.C.G.S. § 66-153 ("NCTSPA"). The NCTSPA defines trade secret misappropriation as "acquisition, disclosure, or use of a trade secret of another without express or implied authority or consent . . . ." *Id.* § 66-152. A trade secret, in turn, is defined as follows:

> [B]usiness or technical information, including but not limited to a formula, pattern, program, device, compilation of information, method, technique, or process that:
>
> (a) Derives independent actual or potential commercial value from not being generally known or readily ascertainable through independent development or reverse engineering by persons who can obtain economic value from its disclosure or use; and
>
> (b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

N.C.G.S. § 66-152.

90. Plaintiff bases its misappropriation of trade secrets claim upon Joseph's and William's access to and use of NFH's customer list and other confidential customer information at Troutman Funeral Home. (Am. Compl. ¶¶ 86–93.) Plaintiff alleges that its customer list, pre-arrangement contract terms, and specific customer

needs are "confidential and proprietary and . . . valuable commercial asset[s] to NFH." (Am. Compl. ¶ 86.)

91. Defendants argue that Plaintiff has not alleged with sufficient specificity any trade secret. The Court disagrees. Our Supreme Court has recently explained why private customer lists like those alleged here can be a protected trade secret. *See Krawiec*, 370 N.C. at 610, 811 S.E.2d at 548. The key is whether "[D]efendants could have compiled a similar database through public listings" or otherwise readily derived the information without access to the trade secrets. *Id.* Plaintiff has affirmatively alleged that its database was compiled from information not "generally known or readily ascertainable[,]" (Am. Compl. ¶ 87), and that "[g]iven the ways that (a) NFH's customers are developed and (b) the long period of time over which it is compiled, it would be impossible for anyone to duplicate a list of NFH's customers, or any significant portion of it," (Am. Compl. ¶ 35). Accordingly, the Court concludes that Plaintiff has sufficiently alleged that its information is a trade secret under Chapter 66.

92. Defendants also argue that Plaintiff has not alleged how or in what capacity Joseph and William misappropriated NFH's alleged trade secrets. As to William, the Court believes the Amended Complaint is sufficiently clear in this regard. The Amended Complaint alleges that William accessed NFH's computer system without authorization, (Am. Compl. ¶ 51), and downloaded trade secret information in the period leading up to his resignation, (Am. Compl. ¶¶ 52–55). The Amended Complaint further alleges that William continued to log into the website of an NFH

vendor even after his resignation from employment with NFH which gave him access to Plaintiff's trade secret information. (Am. Compl. ¶ 64.) Since trade secret misappropriation encompasses "acquisition . . . without express or implied authority or consent," these statements are adequate to allege misappropriation with respect to William. *See* N.C.G.S. § 66-152.

93. In contrast, however, the allegations against Joseph are far less specific. In fact, the allegations against Joseph come close to solely relying on the "inevitable disclosure" doctrine.[13] (*See* Am. Compl. ¶ 71 ("[Joseph's and William's] competitive activities . . . will inevitably lead to the disclosure of NFH's confidential information . . . .").) This doctrine has not been adopted by the North Carolina courts. *See DSM Dyneema, LLC*, 2015 NCBC LEXIS 50, at \*16 (citing *Analog*, 157 N.C. App. at 470, 579 S.E.2d at 454–55).[14]

94. Here, while there is an "inevitable disclosure" component to Plaintiff's allegations, Plaintiff also affirmatively alleges that Joseph has used the alleged trade

---

[13] The inevitable disclosure doctrine is applied on occasion by courts in other states "when an employee who knows trade secrets of his employer leaves that employer for a competitor and, because of the similarity of the employee's work for the two companies, it is 'inevitable' that he will use or disclose trade secrets of the first employer." *See Analog Devices, Inc. v. Michalski*, 157 N.C. App. 462, 470 n.3, 579 S.E.2d 449, 454 (2003).

[14] In *DSM Dyneema*, this Court analyzed a misappropriation of trade secrets claim where the defendant argued for dismissal on the theory that the plaintiff's claim was based on the inevitable disclosure doctrine. *DSM Dyneema*, 2015 NCBC LEXIS 50, at \*16. There, Judge Bledsoe concluded that while there was clearly an "inevitable disclosure" component to the plaintiff's allegations, its claim was "based on more than simply the fact that [the defendant] had access to [the plaintiff's] alleged trade secrets and then went to work for a competitor[.]" *Id.* at \*17. In fact, the defendant there was a "chief scientist" at the plaintiff's company, who downloaded trade secret information from his computer and then used that information to win a competing contract. *Id.*

secret information that William downloaded from his NFH computer "in the operation of TFH and specifically to solicit NFH's customers." (Am. Compl. ¶¶ 56, 64, 65.) Moreover, Plaintiff alleges that Joseph and TFH have been able to quickly sign a number of former NFH's customers to pre-arrangement contracts in a way that only someone with Joseph's level of access to the trade secret information could have accomplished. (Am. Compl. ¶¶ 34, 66.) The Court concludes that these allegations, while sparse, are nonetheless sufficient to survive dismissal at this stage without reference to the inevitable disclosure doctrine.

95. Accordingly, because the Amended Complaint adequately alleges the existence and identity of trade secrets and their actual misappropriation and use, the Motion is DENIED to the extent it seeks dismissal of Plaintiff's second claim for relief.

### D.     Count IV:[15] Breach of Fiduciary Duty (Joseph and William)

96. Plaintiff's fourth claim for relief alleges that Joseph and William owed and breached fiduciary duties to NFH. (Am. Compl. ¶¶ 100–10.) A breach of fiduciary duty claim requires a plaintiff to allege and show (1) that the defendant owes to plaintiff a fiduciary duty through the existence of a fiduciary relationship, and (2) that the defendant breached that duty. *See Green v. Freeman*, 367 N.C. 136, 141, 749 S.E.2d 262, 268 (2013). The Court's inquiry in this case turns on whether, at the relevant times, Joseph and William were officers of NFH owing the company fiduciary duties or whether they were mere employees without any such duties.

---

[15] As noted previously, Plaintiff has voluntarily dismissed without prejudice Count III.

97. In determining whether either Joseph or William was a fiduciary of NFH, the Court is mindful that, in North Carolina, the "relation of employer and employee is not one of those regarded as confidential." *Dalton v. Camp*, 353 N.C. 647, 651–52, 548 S.E.2d 704, 707–08 (2001). *Dalton* has been read to demonstrate "that North Carolina courts are extremely hesitant to burden employees with [fiduciary] duties to their employers." *Eli Research Inc. v. United Communs. Grp., LLC*, 312 F. Supp. 2d 748, 760 (M.D.N.C. 2004).

98. In contrast to the duties owed by a mere employee, a corporate officer owes a statutory fiduciary duty to discharge his obligations in good faith, with the care of a prudent person in a like position, and in a manner reasonably believed to be in the best interests of the corporation. *See* N.C.G.S. § 55-8-42; *see also*, *Loy v. Lorm Corp.*, 52 N.C. App. 428, 436, 278 S.E.2d 897, 903 (1981) ("Directors owe a duty of fidelity and due care in the management of a corporation and must exercise their authority solely for the benefit of the corporation and all its shareholders."); *Pierce Concrete, Inc. v. Cannon Realty & Constr. Co.*, 77 N.C. App. 411, 413–14, 335 S.E.2d 30, 31 (1985) (declaring that corporate officers' "fiduciary duty to the corporation is a high one").

99. Here, Defendants argue that Joseph was never an officer of the company and that if he was, his tenure extended no later than August 2008. However, on a Rule 12(b)(6) motion, the Court considers the facts as alleged by Plaintiff to be true. In the Amended Complaint, Plaintiff alleges that Joseph and William were both

corporate officers and continued in those roles "until their resignations" in late 2018. (Am. Compl. ¶ 20.)

100. Specifically, Joseph is alleged to have been NFH's Vice President, Chairman of Operations, and President, and William is alleged to have been NFH's Treasurer. (Am. Compl. ¶ 20.) Exhibit E to the Amended Complaint is a January 2018 listing of NFH's officers which lists William as "Treasurer." (Ex. E to Am. Compl.) At this stage of the litigation, and based on the allegations of the Amended Complaint, Plaintiff has sufficiently alleged that Joseph and William were officers of NFH at relevant times, and therefore owed fiduciary duties to the company.

101. Moreover, allegations, like those alleged here, that a fiduciary prepared to establish a competing business, while concealing that business opportunity from the company to whom he owed fiduciary duties, may be sufficient to support a breach of fiduciary duty claim. *See, e.g., SCA-Blue Ridge, LLC v. WakeMed*, 2016 NCBC LEXIS 2, at *20–26 (N.C. Super. Ct. Jan. 4, 2016). Accordingly, the Motion is DENIED insofar as it seeks dismissal of Plaintiff's breach of fiduciary duty claim against Joseph and William.

**E.    Count V: Tortious Interference with Contract (Joseph, William, Abbi, and TFH, Inc.)**

102. Plaintiff's fifth claim for relief is based on alleged interference with two different sets of contracts: first, Plaintiff alleges that William, Abbi, and TFH, Inc. tortiously interfered with Joseph's obligations pursuant to the Agreements by inducing Joseph to violate his non-compete and confidentiality provisions contained therein, (Am. Compl. ¶ 114); and second, Plaintiff also alleges that Joseph, William,

Abbi, and TFH, Inc. interfered with the pre-arrangement contracts between NFH and its customers. (Am. Compl. ¶ 117.)

103. Our Supreme Court has identified the five elements of a tortious interference with contract claim as follows: "(1) a valid contract between the plaintiff and a third person which confers upon the plaintiff a contractual right against a third person; (2) the defendant knows of the contract; (3) the defendant intentionally induces the third person not to perform the contract; (4) and in doing so acts without justification; (5) resulting in actual damage to plaintiff." *Kuykendall,* 322 N.C. at 661, 370 S.E.2d at 387. "Generally speaking, interference with contract is justified if it is motivated by a legitimate business purpose, as when the plaintiff and the defendant, an outsider, are competitors." *Embree Constr. Grp., Inc. v. Rafcor, Inc.*, 330 N.C. 487, 498, 411 S.E.2d 916, 924 (1992).

104. As an initial matter, the Court addresses this claim as brought by Plaintiff against Abbi. The allegations in the Amended Complaint do not show that Abbi had a role at NFH or was otherwise involved in her husband or father-in-law's business affairs at NFH. To the contrary, she is seldom mentioned in the Amended Complaint, and the only allegation tying her to Plaintiff's claims is that, due to her "close familial relationship" with Joseph (as his daughter-in-law), she had knowledge of the Agreements.[16] (Am. Compl. ¶ 113.)

---

[16] The Amended Complaint does not allege that Abbi had any knowledge of the pre-arrangement contracts, and therefore Plaintiff's tortious inference claim against Abbi cannot be based on those contracts. (*See* Am. Compl. ¶ 116 (mentioning only Joseph and William).)

105. As noted previously, while the Court must accept factual allegations as true on a Rule 12(b)(6) motion, the Court need not accept unwarranted deductions or inferences. *See Good Hope Hosp., Inc.,* 174 N.C. App. at 274, 620 S.E.2d at 880. The Court does not believe that a close familial relationship, standing alone, is sufficient to impute knowledge of a family member's post-employment contractual obligations. There is no allegation that Abbi ever saw the Agreements, ever heard Joseph and William discussing their employment at NFH, or even their desire to purchase Troutman Funeral Home and the implications thereof. Rather, Abbi is identified in this lawsuit simply as William's wife and Joseph's daughter-in-law and, "upon information and belief," as one of the owners of Troutman Funeral Home. (Am. Compl. ¶ 60.) Accordingly, Plaintiff has failed to sufficiently allege Abbi's knowledge of the Agreements. In addition, other than the bare-boned legal assertions under Plaintiff's tortious interference claim heading, (Am. Compl. ¶¶ 113, 114, 119)—which the Court is entitled to ignore, *McCrann v. Pinehurst, LLC*, 225 N.C. App. 368, 377, 737 S.E.2d 771, 777 (2013)—the Amended Complaint does not allege any facts to support the remaining elements of Plaintiff's tortious interference claim against Abbi. Therefore, the Court dismisses without prejudice Plaintiff's tortious interference claim against Abbi.

106. As to Plaintiff's claim against William and TFH, Inc. regarding alleged tortious interference with Joseph's post-employment obligations, it follows from the Court's earlier conclusion about the unenforceability of the Restrictive Covenants that William and TFH, Inc. cannot be liable for tortious inference on that basis. That

said, Plaintiff's claim may proceed against them if the Court concludes that Plaintiff has sufficiently alleged that these two defendants tortiously interfered with Joseph's confidentiality obligations contained in the Agreements.

107. At this time, the Court concludes that the allegations of the Amended Complaint taken as a whole, and solely for purposes of evaluation of the Amended Complaint under a 12(b)(6) standard, indicate that William, and TFH, Inc. with William as its agent, knew of Joseph's Agreements and his post-employment obligations therein. The Amended Complaint further alleges that William and TFH, Inc. employed Joseph at Troutman Funeral Home in direct competition with NFH and encouraged him to use NFH's confidential information to run Troutman Funeral Home and solicit customers for the competing business. Finally, the Amended Complaint alleges that Joseph used NFH's confidential information improperly. (*See, e.g.,* Am. Compl. ¶ 117.) Thus, at this stage in the proceedings, the Court finds Plaintiff's allegations sufficient under Rule 12(b)(6) to withstand the Motion as to William and TFH, Inc.'s alleged tortious interference, at least insofar as the interference claim is based on Joseph's alleged violation of his confidentiality obligations under the Agreements.

108. Plaintiff also brings a tortious interference claim against Joseph, William, and TFH, Inc. based on these defendants' alleged interference with NFH's pre-arrangement contracts between it and its customers. Plaintiff contends that this interference has resulted in the loss of over $140,000 in pre-arrangement contracts. (Am. Compl. ¶ 66.)

109. Defendants argue that Plaintiff's claim based on these grounds should be dismissed because the pre-arrangement contracts are freely transferable and the law does not recognize tortious interference with a freely transferable contract. Defendants' argument is basically that, by being freely transferable, the contract between NFH and its pre-arrangement customers are terminable at will.

110. The Court is unpersuaded by Defendants' argument, at least at this early stage of the proceeding. The pre-arrangement contracts are alleged to be valid contracts that confer a benefit upon Plaintiff, and therefore can be the basis of a tortious inference claim like other at will contracts. *See Kuykendall*, 322 N.C. at 661, 370 S.E.2d at 387; *see also Childress v. Abeles*, 240 N.C. 667, 678, 84 S.E.2 176, 184 (1954) (concluding that a plaintiff's tortious interference claim can be based on an employment contract that was terminable at will).

111. Accordingly, the Court concludes Plaintiff's tortious interference claim based on Joseph, William, and TFH, Inc.'s alleged interference with NFH's pre-arrangement contracts should not be dismissed at this time for this reason.

112. Based on the foregoing, the Motion is DENIED in part and GRANTED in part as to Plaintiff's tortious interference claim brought against Joseph, William, and TFH, Inc. However, the Motion is GRANTED as to this claim brought against Abbi and the claim against her is dismissed without prejudice to Plaintiff's ability to reassert this claim (through proper allegations and in conformity with the Court's analysis herein).

**F.  Count VI: Fraudulent Concealment (Joseph and William)**

113.  Plaintiff's sixth claim for relief alleges that Joseph and William fraudulently concealed material information from NFH.  (Am. Compl. ¶¶ 120–126.) North Carolina law permits fraud claims to be based on either: (1) affirmative misrepresentations; or (2) concealment or nondisclosure of material facts.  *See Kron Medical Corp. v. Collier Cobb & Assoc., Inc.*, 107 N.C. App. 331, 339, 420 S.E.2d 192, 197 (1992) (citing *Rosenthal v. Perkins*, 42 N.C. App. 449, 452, 257 S.E.2d 63, 66 (1979)).

114.  Fraud claims based on either theory must be pled with particularity pursuant to Rule 9(b), but what is required to meet that standard differs between the two.  Where a fraud claim is based on concealment or nondisclosure of material facts, a plaintiff must allege that the defendant(s) "had a duty to disclose material information to [the plaintiff], as silence is fraudulent only when there is a duty to speak."  *Lawrence v. UMLIC-Five Corp.*, 2007 NCBC LEXIS 20, at *8 (N.C. Super. Ct. June 18, 2007) (citing *Griffin v. Wheeler-Leonard & Co.*, 290 N.C. 185, 198, 225 S.E.2d 557, 565 (1976)).  This Court has acknowledged that "fraud by omission is, by its very nature, difficult to plead with particularity."  *Id.* at *9 (quoting *Breeden v. Richmond Cmty. Coll.*, 171 F.R.D. 189, 195 (M.D.N.C. 1997)).  Recognizing this difficulty, Judge Diaz of this Court adopted the factors considered by the *Breeden* court on fraud by omission claims.  *Id.* at *10.  Accordingly, for a fraudulent omission claim to survive a 12(b)(6) challenge, a plaintiff must allege:

> (1) the relationship [between plaintiff and defendant] giving rise to the duty to speak; (2) the event or events triggering the duty to speak and/or

the general time period over which the relationship arose and the fraudulent conduct occurred; (3) the general content of the information that was withheld and the reason for its materiality; (4) the identity of those under a duty who failed to make such disclosures; (5) what [the defendant] gained by withholding information; (6) why plaintiff's reliance on the omission was both reasonable and detrimental; and (7) the damages proximately flowing from such reliance.

*Id.* (citing *Breeden*, 171 F.R.D. at 195); *see also Christenbury Eye Ctr., P.A. v. Medflow, Inc.*, 2015 NCBC LEXIS 64, at *13–14 (N.C. Super. Ct. June 19, 2015).

115. Here, the Court concludes that Plaintiff has properly pled six of the seven elements of this claim. First, as explained above, Plaintiff has sufficiently alleged that both Joseph and William are officers and fiduciaries of NFH. Our Court of Appeals has held that a duty to disclose material information arises where there is a fiduciary relationship between the parties to a transaction. *Harton v. Harton*, 81 N.C. App. 295, 297–98, 344 S.E.2d 117, 119 (1986). Accordingly, the first and forth elements of Plaintiff's claim have been pled.

116. Second, Plaintiff has alleged that Joseph and William specifically had a duty to speak about their "pursuit of and employment with a competing business with NFH." (Am. Compl. ¶ 122.) This duty to speak arose when Joseph and William "took material steps to pursue the purchase of and employment with Troutman Funeral Home[.]" (Am. Compl. ¶ 123.) Plaintiff further provides some detail on what those "material steps" included. For example, Plaintiff alleges the duty to speak arose as soon as Joseph and William began engaging in conversations with the previous owners of Troutman Funeral Home to purchase their business, or at least when they submitted a letter of intent or similar document to purchase the company. (Am.

Compl. ¶ 124.) If not at this time, Plaintiff alleges that the duty to speak arose during Joseph's and William's preparation and/or filing of organizational documents for TFH, Inc. (Am. Compl. ¶ 124.) While the Amended Complaint is silent on when the Troutmans began discussions with the Sappenfields about the purchase of Troutman Funeral Home, the Amended Complaint does disclose that TFH, Inc. was formed on December 6, 2018 listing William as the registered agent, when William was still an officer and employee of NFH. (Am. Compt. ¶¶ 58, 59.) Therefore, the Court concludes that Plaintiff has adequately alleged the second element of this claim.

117. Third, as to the information withheld, Plaintiff has alleged that Joseph and William failed to disclose their plans to purchase Troutman Funeral Home, a direct competitor of NFH, and that a competing business run by NFH's former officers would be detrimental to NFH. (*See, e.g.,* Am. Compl. ¶ 69.) Plaintiff also alleges that Joseph's and William's concealment of their plans was material: had it known about the Troutmans' intentions to purchase a competing business, NFH would have had the opportunity to protect its confidential information as well as make a public statement regarding the departure of two key employees. (Am. Compl. ¶ 125.) Based on these allegations, the Court concludes that Plaintiff has sufficiently pled this third element.

118. As to the fifth element, Plaintiff has alleged throughout the Amended Complaint that Joseph and William were able to access, and in the case of William download, NFH's confidential information, which would "help [Troutman Funeral Home] shortcut the path to attract customers and to convince them to transfer their

pre-arrangement contracts from NFH to [Troutman Funeral Home]." (Am. Compl. ¶ 69.) This is sufficient to allege the fifth element of Plaintiff's fraudulent concealment claim.

119. Plaintiff has also alleged damages stemming from Joseph's and William's concealment of their intentions regarding Troutman Funeral Home, namely that NFH's inability to proactively protect their confidential information and pre-arrangement contracts led to the transfer of over $140,000 in contract value from NFH to Troutman Funeral Home. (Am. Compl. ¶¶ 66, 125, 126.) Therefore, the seventh element of this claim is sufficiently pled to withstand dismissal on Defendants' Motion.

120. However, Plaintiff has failed to allege that NFH relied on Joseph's and William's concealment, or how any such reliance was reasonable. For example, NFH has not alleged any facts to indicate that NFH reasonably believed Joseph and William planned to stay at NFH after CMS's acquisition of the company, or that it was otherwise reasonable for NFH to assume Joseph and William would not purchase a competing business that CMS, NFH's new owner, knew was for sale. (*See* Am. Compl. ¶ 49 (alleging that CMS submitted a letter of intent to purchase Troutman Funeral Home).)

121. Because Plaintiff has failed to plead one of the necessary elements of its fraudulent concealment claim, the Court concludes that Plaintiff's sixth claim for relief must be dismissed without prejudice and the Motion is GRANTED as to this claim.

G.   **Count VII: Unfair or Deceptive Trade Practices (Joseph, William, Abbi, and TFH, Inc.)**

122.   Plaintiff also alleges that Joseph, William, Abbi, and TFH, Inc. committed unfair and deceptive trade practices by misappropriating NFH's trade secrets.[17] (Am. Compl. ¶¶ 128, 129.)  Further, Plaintiff alleges that William's, Abbi's, and TFH, Inc.'s tortious interference with Joseph's performance of the Agreements constitutes an unfair or deceptive trade practice.  (Am. Compl. ¶ 128.)

123.   North Carolina law has created a private right of action under Chapter 75 ("UDTP Claim") as part of its effort to protect consumers from unfair or deceptive trade practices.  *See* N.C.G.S. § 75-1.1 (outlawing unfair or deceptive practices in trade) *and* N.C.G.S. § 75-16 (creating private right of action and authorizing treble damages).   The three elements of a *prima facie* unfair or deceptive trade practices claim are (1) an unfair or deceptive trade practice, (2) in or affecting commerce, and (3) proximately causing actual injury.  *See Mitchell v. Linville*, 148 N.C. App. 71, 73, 557 S.E.2d 620, 623 (2001).  The few elements of the tort belie the extent of the jurisprudence that has gone into defining its bounds.  There are, in fact, several recognized categories of conduct that our courts have determined fall outside the scope of Chapter 75.  Notably, our court of appeals held in *Buie v. Daniel International Corp.* that "employer-employee relationships do not fall within the intended scope of G.S. 75-1.1[.]" *Buie v. Daniel Int'l Corp.*, 289 S.E.2d 119–20 (N.C. Ct. App. 1982).

---

[17] Plaintiff also originally based its UDTP claim on its now-dismissed conversion of intellectual property claim.

124. Plaintiff has alleged that Joseph and William misappropriated NFH's trade secrets and other confidential information in order to further the success of a competing business they purchased while concealing from NFH their efforts toward purchasing that business. Although Joseph and William were employees of NFH, the conduct complained of in the Amended Complaint extended beyond their roles as employees, and rather covered their self-dealing conduct and decision to engage in competing "business activities" alleged to be in breach of their fiduciary duties to the Plaintiff.

125. Under well-settled North Carolina law, a violation of North Carolina's Trade Secret Protection Act may support liability under N.C.G.S § 75-1.1. *See, e.g.*, *Ge Betz, Inc. v. Conrad*, 231 N.C. App. 214, 236, 752 S.E.2d 634, 650 (2013). Further, Plaintiff's claim for tortious interference with contract survives dismissal in part as to Defendants Joseph, William, and TFH, Inc. This claim, like Plaintiff's Trade Secret claim, may constitute the basis for a 75-1.1 claim. *Roane-Barker v. Se. Hosp. Supply Corp.*, 99 N.C. App. 30, 41, 392 S.E.2d 663, 670 (1990).

126. Therefore, Plaintiff's UDTP claim as against Joseph, William and TFH, Inc. (to the extent Joseph or William is alleged to be its agent) is sufficiently pled to survive dismissal under Rule 12(b)(6). The Motion, therefore, is DENIED as to this claim against these defendants.

127. As to Abbi, however, since the Court has already concluded that Plaintiff has failed to allege a tortious inference claim against her—the sole claim upon which

this UDTP claim against her is based,[18] (*see* Am. Compl. ¶ 128)—Plaintiff's UDTP claim against Abbi must also be dismissed (without prejudice) and the Motion is GRANTED in this respect.

### H. Count VIII: Unjust Enrichment (Joseph)

128. Plaintiff's eighth and final claim, lodged solely against Joseph, sounds in unjust enrichment. (Am. Compl. ¶ 133.) Plaintiff claims that, if its breach of contract claim against Joseph fails, then Joseph was unjustly enriched and Plaintiff is entitled to receive all of the funds paid for Joseph's agreement not to compete with NFH, including both the original $500,000 paid over a period of ten years (from 2003–2013), as well as the continuing $1,000 per month payments made from 2013 up until Joseph's resignation in December of 2018. (Am. Compl. ¶ 134.)

129. Our Court of Appeals has explained that a valid *prima facie* claim for unjust enrichment has five elements:

> First, one party must confer a benefit upon the other party . . . . Second, the benefit must not have been conferred officiously, that is it must not be conferred by an interference in the affairs of the other party in a manner that is not justified in the circumstances. Third, the benefit must not be gratuitous. Fourth, the benefit must be measurable. Last, "the defendant must have consciously accepted the benefit."

*JP Morgan Chase Bank, Nat'l Ass'n v. Browning*, 230 N.C. App. 537, 541–42, 750 S.E.2d 555, 559 (2013).

130. Defendant responds with four arguments: (1) Strandburg is not a party to the Amended Complaint and therefore NFH cannot make a claim that Joseph was

---

[18] Paragraph 128 generally states that Plaintiff's UDTP Claim is premised on all Defendants' misappropriation of NFH's trade secrets, but Plaintiff's misappropriation of trade secrets claim is only brought against Joseph and William.

unjustly enriched by payments she made, (2) an unjust enrichment claim cannot be made when a contract governs the same subject matter, (3) the $1,000 per month payments were not for a non-compete but instead were consideration for employment, and (4) the statute of limitations has run on any implied contractual claim like unjust enrichment.

131. The first argument is straightforward and unconvincing, at least at the 12(b)(6) stage. While Strandburg, who purchased Joseph's stock, is not a party to this lawsuit, paragraph 42 of the Amended Complaint alleges that ". . . as consideration for the post-employment restrictions in the agreements, NFH paid to Joseph an initial five hundred thousand dollars[.]" (Am. Compl. ¶ 42.) Additionally, the Employment Agreement was between Joseph and NFH, and the SPA was between Joseph, Strandburg, and NFH. This is not a claim based on NFH attempting to assert Strandburg's rights, but instead is one in which NFH asserts its own rights under the Agreements.

132. Defendants' second argument is similarly unavailing. It is well established that unjust enrichment can be pled in the alternative to a breach of contract claim, as Plaintiff explicitly stated it is doing here. (Am. Compl. ¶ 133.) This can be true when non-compete covenants are invalidated but are a part of a larger agreement that remains legally binding. *See, e.g., Campbell Oil Co. v. AmeriGas Propane, LP*, 2016 NCBC LEXIS 50, at *11 (N.C. Super. Ct. July 8, 2016) (holding that an unjust enrichment claim can survive when a non-compete was unenforceable, the consideration for the non-compete was distinct from that provided for the rest of the

agreement, and the contract contained a severability clause). Thus, the fact that a contract covers the same subject matter does not defeat Plaintiff's unjust enrichment claim at the Rule 12(b)(6) stage.

133. As for Defendants' third argument, Defendants' counter-factual allegations that the $1,000 monthly payments were further consideration in the form of monthly bonuses for Joseph's continued employment are of no consequence. On a Rule 12(b)(6) motion, the Court takes Plaintiff's factual allegations as true and does not consider any factual statements provided by Defendants to rebut those allegations.

134. The statute of limitations is also not a bar to recovery here. Unjust enrichment is a claim on an implied contract and therefore must be brought within three years of accrual. *See Stratton v. Royal Bank of Can.*, 211 N.C. App. 78, 85, 712 S.E.2d 221, 228 (2011). The period begins to run "when the wrong is complete[,]" whether or not it is discovered. *See Housecalls Home Health Care, Inc. v. State*, 200 N.C. App. 66, 70, 682 S.E.2d 741, 744 (2009). Reading the Amended Complaint in the light most favorable to Plaintiff, Plaintiff has alleged that the breach occurred when Joseph committed to go into competition with NFH, which is less than a year before the original complaint was filed. Since the $1,000 monthly payments allegedly continued into 2018, at least some of the payments are not time-barred. Accordingly, Plaintiff's unjust enrichment claim survives dismissal at this stage, and the Motion is DENIED in that respect.

### I. Punitive Damages

135. Associated with the aforementioned claims for relief, the Amended Complaint contains a request against Joseph, William, Abbi, and TFH, Inc. for punitive damages. At the July 24, 2019 hearing on the Motion, Plaintiff's counsel withdrew the request for punitive damages. Therefore, Plaintiff's request for punitive damages is hereby deemed **WITHDRAWN** and the Motion, to the extent it seeks dismissal of this request, is **DENIED** as moot.

### V. CONCLUSION

136. For the foregoing reasons, the Court hereby **ORDERS** as follows:

A. The Motion is **GRANTED** as to Plaintiff's breach of contract claim against Joseph premised on Joseph's alleged breach of the Restrictive Covenants in the Employment Agreement. This claim is therefore **DISMISSED WITH PREJUDICE** as to breach of those covenants.

B. The Motion is **DENIED** as to Plaintiff's breach of contract claim against Joseph premised on Joseph's alleged breach of the confidentiality provisions appearing in Paragraph 4 of the Employment Agreement and Section 4.01 of the SPA. This claim, therefore, shall proceed.

C. The Motion is **GRANTED** as to Plaintiff's tortious interference with contract claim against William, Abbi, and TFH, Inc. premised on their alleged interference with Joseph's Restrictive Covenants. The Motion is **DENIED** as to this same claim brought against William and TFH,

Inc. premised on their alleged interference with Joseph's confidentiality obligations under the Agreements. The Motion is **DENIED** as to this claim brought against Joseph, William, and TFH, Inc. premised on their alleged interference with NFH's pre-arrangement contracts.

D.   The Motion is **GRANTED** as to Plaintiff's fraudulent concealment claim against Joseph and William. This claim is **DISMISSED WITHOUT PREJUDICE**.

E.   The Motion is **GRANTED** as to all claims against Abbi. Except as otherwise indicated, these claims against her are **DISMISSED WITHOUT PREJUDICE**.

F.   The Motion is **GRANTED** as to all claims against SC, LLC. These claims are **DISMISSED WITHOUT PREJUDICE**.

G.   Plaintiff's request for punitive damages is **WITHDRAWN,** and Plaintiff shall not be entitled to recover punitive damages based on the Amended Complaint.

H.   Except as otherwise expressly provided, the Motion is **DENIED**.

**SO ORDERED**, this the 29th day of October, 2019.


/s/ Michael L. Robinson
Michael L. Robinson
Special Superior Court Judge
  for Complex Business Cases